**ELLENDALE FARMERS UNION COOP-ERATIVE ASSOCIATION, Plaintiff/Appellant,**

v.

**Newton DAVIS, Defendant/Appellee.**

**Civ. No. 8986.**

Supreme Court of North Dakota.

June 28, 1974.

Hjellum, Weiss, Nerison, Jukkala & Vinje, Jamestown, for appellant.

James N. Purdy, Ellendale, for appellee.

TEIGEN, Justice.

The plaintiff, Ellendale Farmers Union Cooperative Association (hereinafter Cooperative), has appealed from the judgment in this action, which action was tried to the court without a jury.

■ We are met at the outset with a procedural problem as the Cooperative also purports to appeal from an order granting the defendant's motion to amend the findings of fact. This is not an appealable order and a jurisdictional question arises, although neither party has taken issue thereon.

It appears from the record submitted on this appeal that following the entry of judgment the defendant, Newton E. Davis (hereinafter Davis), moved for an order amending the findings of fact, conclusions of law and order for judgment, which had been prepared by counsel for the Cooperative and signed by the court. The motion was resisted by the Cooperative and, after a hearing, the record of which was not certified to us, the trial court entered amended findings of fact, conclusions of law and order for judgment. The amended instrument merely amends the findings of fact; it does not change the amount contained in the order for judgment. However, it provides that the amended instrument supersedes and replaces the original findings of fact, conclusions of law and order for judgment.

■ A review of the record discloses that a new judgment has not been entered on the amended instrument. In view of the fact that no issue has been raised and because the amount of the judgment directed to be entered remains the same, it appears that both parties considered the original judgment entered as being the judgment entered on the amended findings of fact, conclusions of law and order for judgment. Therefore we will construe this amended instrument as having been entered nunc pro tunc and standing as authority for the judgment from which the appeal is taken.

Davis is a large hog raiser and, although he also farms eleven quarter sections of land and feeds sheep and cattle, it appears that about 40% of his gross income is from the sale of hogs. Over the years he has purchased a good portion of the feed for his pigs from the Cooperative. The Cooperative operates a feed manufacturing plant and Davis purchased one ton of pig feed called "Extra Pig Developer Medicated Feed" from the Cooperative which he intended to feed to 90 young pigs approximately three-to four-months old. These pigs were kept in a pen separate and apart from the rest of his pigs. Shortly after the purchased pig feed was fed to the 90 pigs, 32 of them died and the rest were stunted in growth.

Thereafter, in December 1970, the Cooperative brought this action against Davis for goods, wares and merchandise sold to Davis between the dates of March 31, 1968, and January 7, 1970, in the amount of $2,150.89. Davis answered and counterclaimed. In his answer he admitted his indebtedness to the Cooperative in the amount of $2,150.89. In his counterclaim he seeks damages in the amount of $2,490, based on a claim of breach of warranty. Davis alleges that the feed purchased from the Cooperative was warranted as being suitable for feeding pigs; that the feed was toxic because it contained an excessive amount of salt, resulting in the damages prayed for. The Cooperative replied, admitting that the feed sold to Davis was warranted as being suitable and safe for feeding to pigs, but denied that the feed was responsible for the death or injury to Davis's pigs.

The trial court found in favor of the Cooperative on its claim in the amount of $2,150.89, and also found in favor of Davis

on his counterclaim and awarded Davis damages in the amount of $1,310 as an off-set. Thus the judgment entered in favor of the Cooperative was for the difference, to wit, the sum of $840.89.

The Cooperative has raised six claims of error in allowing Davis's counterclaim. We have combined these six claims of error into three issues as follows:

(1) Insufficiency of the evidence to sustain the judgment on the question of liability;

(2) Insufficiency of the evidence to sustain the judgment as to the amount of damages awarded on the counterclaim; and

(3) Error on the part of the court in granting Davis's motion to amend the findings of fact.

It appears that the pen in which the 90 young pigs were kept contained a self-feeder and an automatic watering device. Davis had purchased one ton of the pig developer feed from the Cooperative on October 15, 1968, and he placed it in the feeder located in the pen on or about October 18, 1968. At the time Davis placed the feed in the hopper, or storage area, of the pig feeder it was not empty of feed. Thus, before the new feed added to the storage area moved, by gravity, into the pig troughs located on either side of the feeder, the old feed contained therein first had to be removed. This occurred as the pigs ate the feed. It was estimated that the hopper contained from five to six hundred pounds of old feed when the new feed was added.

On October 24, 1968, approximately six days after the feed purchased from the Cooperative had been added to the pig feeder, Davis discovered that some of his pigs were ill and, within a very short time, 32 of the pigs died and the remaining 58 pigs appeared to be ill. Davis telephoned the manager of the Cooperative, who told him to take some of the pigs in for examination by a veterinarian. The veterinarian examined the pigs and conducted a post-mortem examination on three of the dead pigs. He diagnosed that the deaths and the illness of Davis's pigs had been caused by salt poisoning.

Although Davis had other pigs in other pens, the feed in question was not fed to them. When the veterinarian diagnosed salt poisoning as the cause of the problem, Davis telephoned his farm home and instructed his twin sons, aged fourteen years, to add a different feed to the troughs contained on either side of the pig feeder. This placed additional feed on top of the feed within the troughs. Thus the feed contained in the hopper of the feeder ceased to run into the troughs until the added feed had been eaten.

The following morning samples of the feed were taken from the troughs, some by the manager of the Cooperative and some by Davis, which he delivered to the veterinarian. Each submitted the samples to laboratories for analysis. Four samples were analyzed by the Cooperative's laboratory which reported salt levels of .27%, .5%, .5% and .53%. Two samples were sent by the Cooperative to independent laboratories which reported salt levels of .79% and .90%. The veterinarian sent three samples for analysis: two were sent to the North Dakota State University Veterinary Science Department at Fargo, which reported salt levels of 3.8%, and 3.1%, and one sample was sent to the laboratory at South Dakota State College, which reported a salt level of .84%.

The pig developer manufactured by the Cooperative is a special feed for young pigs to hasten their growth. Prior to feeding the pig developer, Davis had been feeding a pig starter feed. The object of these special feeds is to permit the taking of these young pigs from their mothers at an earlier date in order that she may be bred earlier, thus producing more pigs. The Cooperative introduced an exhibit entitled "Registered Feed Manufacturing Cost Sheet" which shows the proportions of various ingredients contained in the pig

developer feed. This exhibit shows that there are a number of ingredients contained in the feed, such as, soybean meal, meat and bone meal, phosphate, calcium carbonate, arsanilic acid, middlings, alfalfa meal, oats, barley, corn, molasses, bentonite, and other ingredients, including salt. According to this exhibit, .5% salt had been added as an ingredient. In the manufacturing process the feed is formed into pellets. The Cooperative established that it had manufactured ten and one-half tons of this feed in five batches and that it was from this supply that the Davis feed had been obtained. The evidence also establishes that in this particular type of feed a .5% level of salt is a desirable and recommended percentage of salt which should be contained therein. Thus some of the samples tested showed an excess of salt. The trial court accepted the findings on the samples submitted by the veterinarian to independent laboratories which showed salt levels of 3.8%, 3.1% and .84%, all of which were in excess of the recommended level.

The veterinarian was called as an expert witness and testified for Davis. On cross-examination by the Cooperative he produced two books on veterinary medicine. He testified that in accordance with the text contained in these books, salt poisoning may not occur in pigs receiving a ration containing as high as 13% salt if the pigs have a constant, readily available supply of fresh water, but that salt poisoning can occur in rations containing as low as .5% salt if the pigs are deprived of good, fresh water. The veterinarian testified, however, that based on his experience of fifteen years as a veterinarian, the statements made in these medical veterinary books do not always appear to be true. Testifying again, he stated that it was his diagnosis that the Davis pigs died and were injured as the result of having ingested an excessive amount of salt, which is toxic to pigs.

The Cooperative argues that Davis did not furnish his pigs with a constant, adequate amount of good, fresh water. Davis testified that the pen in which the pigs were kept contained an automatic watering device in which the water is automatically kept at a certain level at all times; that the same watering device is so situated that it also supplied water to the pigs in the adjacent pen, none of which had suffered any ill effects. He also testified that the water was fed to the automatic watering device under pressure through pipes leading from his house, and that the water supplied to the pen was the same as that used in the house by himself and his family. He also testified that the water tasted salty and could not be used for coffee but that a sample of the water had been tested by the State Department of Health and was found to be potable. No evidence was introduced to show the salt content of the water.

It is also indicated from the testimony that sale poisoning may occur as a result of salt contained in the rations fed to pigs plus the salt contained in the water supplied, and that the combination can be lethal.

Davis also testified that the same source of water had been used in the same automatic watering device for a period of three years prior to this incident, and that it was still being used on the date of the trial, which was three years after the incident. There is no evidence that the automatic watering device was not functioning at the time in question, although the Cooperative suggests that, because the incident occurred in October, the watering device may have been frozen. There is, however, no evidence of the temperatures at the time, and to hold that the automatic watering device was not functioning or that the water had frozen would be purely speculative.

The trial court indicated in its oral decision issued from the bench that the salt poisoning could have occurred as a result of the combination of the feed containing salt in an amount in excess of the recommenced level coupled with the salt con-

tained in the water, thus indicating that the proximate cause of Davis's loss was the excessive amount of salt contained in the feed sold to Davis by the Cooperative.

The Cooperative also argues that Davis, subsequent to this incident, fed the remaining portion of the pig developer feed to other pigs and has reported no adverse results. Davis, however, testified that before feeding it to the other pigs he mixed the remaining portion of the feed with other feed produced on his farm.

Specifically, the Cooperative urges that the trial court erred in finding as a fact: (1) that Davis's pigs died and were stunted as a result of salt poisoning; and (2) that Davis's pigs had access to an ample supply of water.

The trial court heard the witnesses and observed them as they testified, and made its findings of fact on the basis of its judgment. We, however, in our review of these findings are bound by Rule 52(a), N.D.R.Civ.P., which provides:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

Under the circumstances of this case, there being substantial evidence to sustain the findings of the trial court, we cannot say that the trial court erred in these findings. We must therefore affirm the trial court as to these two findings of fact.

The next issue which we will consider is whether the trial court erred in allowing Davis's counterclaim in the amount of $1,310.

The Cooperative argues that there is no basis in the evidence for computing damages in excess of the value of the pigs which died, the veterinarian's bill, and the cost of the feed. The 32 pigs which died were valued at $20 each, for a total of $640; the veterinarian's bill for services was $20; and the cost of the one ton of feed purchased from the Cooperative was $70. These amounts total $730. However, the amount of damages allowed was $1,310, leaving a balance of $580 awarded as damages because of the effect of the salt poisoning on the remaining 58 pigs which were stunted.

According to the testimony of Davis, he calculated that the average retardation of the stunted pigs was ninety days. His claim for damages includes the cost of feeding these pigs an extra ninety days at $780, plus labor estimated at $180, and yardage (occupying space which under normal conditions would have been used for other pigs) at $522, for a total of $1,482. No other evidence is submitted by either party as to these damages.

Issue was also taken during trial as to the judgment used by Davis in retaining and feeding these 58 pigs for a period of an additional 90 days in order that they might reach a marketable weight. No evidence, however, was introduced to establish what other action Davis might have taken or what the calculated savings might have been had he taken other action. The Cooperative argues that the stunted pigs should have been sold immediately. However, it has not supplied evidence in support of its contention that this would have mitigated the damages. On the other hand, Davis refutes this claim, testifying that this was his first and only experience with salt poisoning in pigs and that he had no way of knowing how much time it would take for the pigs to reach optimum marketable weight. Further, had he sold the pigs in the stunted and retarded condition, it would have damaged or destroyed his reputation in the market place as a raiser and seller of pigs for slaughter.

The trial court, in its oral decision from the bench, stated that the damages claimed for the remaining 58 pigs was speculative and impossible of absolute determination. However, it determined that the fair damages to allow for the injury to the remaining 58 pigs was $580. This might indicate

an allowance of $10 per pig, although the court did not so state or so find and there is no evidence in the record as to the amount of loss per pig.

The evidence does disclose, however, that prior to the commencement of this action Davis had made a demand upon the Cooperative for damages in the amount of $1,310, which was rejected. On the basis of this evidence we believe the court accepted this evidence as the true value of the total damages proved and then subtracted therefrom the allowance of $730 resulting from the death of the 32 pigs, the cost of the veterinarian's services, and the cost of the feed, which left a balance of $580 which it awarded as damages for the injury to the remaining 58 pigs.

■ In its oral memorandum opinion issued from the bench the trial court seemed to have no problem in its determination that compensable damages should be awarded. There appears to be no uncertainty as to the fact that damages did occur. However it does appear that the trial court was uncertain as to the amount of damages it should award. For example, it stated: "The time element is speculative as to when they were sold and for what amounts." And "the Court feels that the two dollars per hour per day for caring for the pigs · and some of the other aspects mentioned, were too speculative." We have held that uncertainty as to the amount of damages does not preclude recovery and that mathematical certainty as to the amount of recovery is not necessary if a reasonable basis for computing the approximate amount of damages is provided. That is all that the law requires. North American Pump Corp. v. Clay Equipment Corp., 199 N.W.2d 888 (N.D.1972).

■ We are satisfied that the evidence sustains the trial court's finding that there was reasonable certainty that Davis suffered damages and that such damages resulted from the Cooperative's breach of warranty. Therefore recovery may not be denied because the exact amount of damages is difficult to ascertain. North American Pump Corp., *supra*.

The trial court did not allow damages in the amount testified to by Davis but Davis is not complaining. He has not cross-appealed and has not raised the issue of the inadequacy of the amount of his award in his arguments or in his brief. We find there is evidence which could sustain an award greater than that allowed by the court on Davis's counterclaim. Further, we feel that Davis was not precluded from the recovery of damages flowing from consequences which could reasonably have been avoided. We feel that, under the circumstances, the evidence supports Davis's decision to continue to feed the pigs until they had reached a marketable weight. The evidence reflects that underweight pigs are discounted when sold.

Under the circumstances we cannot say that the trial court was clearly erroneous in finding that Davis was damaged in the amount determined, and we affirm the trial court's finding in this respect.

■■ Lastly, we will consider the Cooperative's claim that the trial court erred in amending its findings of fact, conclusions of law and order for judgment. Upon the close of the trial the court made its decision from the bench and directed the attorney for the Cooperative to draw findings of fact, conclusions of law and order for judgment. He did so, and they were signed by the trial judge. After they were served upon the attorney for Davis, he moved for an amendment of the findings of fact as specifically permitted under Rule 52(b), N.D.R.Civ.P. This rule provides, in part:

"Upon motion of a party made not later than 10 days after notice of entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly."

The trial court's decision to amend its findings was made after a hearing at which the Cooperative appeared and resisted the motion. The trial court made its order after it heard the arguments of both parties and was duly advised in the premises. The argument in support of this

claimed error is that the amended findings do not truly incorporate the court's "state of mind" as it existed immediately following trial, in accordance with its oral memorandum decision rendered from the bench. Of course, the principal reason for the rule permitting the trial court to amend its findings is to enable the appellate court to obtain a correct understanding of the factual issues determined by the trial court as a basis for the conclusions of law and judgment it entered thereon. 9 Wright & Miller, Federal Practice and Procedure, Civil, § 2582, at 722. We find that the argument made by the Cooperative does not sustain the challenge. Rule 52(b), N.D.R. Civ.P., specifically provides that the court shall be permitted to "amend its findings or make additional findings." It may also amend the judgment accordingly. However, in this case, there was no amendment or change in the judgment as the amounts determined remained the same. We see no error here.

For the reasons aforesaid, we affirm the judgment.

ERICKSTAD, C. J., and VOGEL, PAULSON and KNUDSON, JJ., concur.