Emilie K. SCHOCK as the Administratrix
of the Leo Schock Estate, Plaintiff
and Appellee,

v.

OCKER INSURANCE CORPORATION,
Defendant, Third-Party Plaintiff,
and Appellee,

and

Vernon General Insurance Co., Defendant.

The PILGRIM LIFE INSURANCE COM-
PANY AND ASSOCIATES, INC., De-
fendant, Cross-Claimant, and Appellant,

v.

GRANT COUNTY STATE BANK, CAR-
SON, North Dakota, Third-Party
Defendant and Appellee.

Civ. No. 9208.

Supreme Court of North Dakota.

Nov. 5, 1976.

Rehearing Denied Nov. 30, 1976.

Wheeler, Wolf, Wefald & Peterson, Bismarck, for Pilgrim Life Insurance Co., defendant, cross-claimant, and appellant; argued by Albert A. Wolf, Bismarck.

Richard P. Rausch, Bismarck, for plaintiff and appellee, Emilie K. Schock, and for third-party defendant and appellee, Grant County State Bank; argued by Richard P. Rausch, Bismarck.

Conmy, Rosenberg & Lucas, Bismarck, for Ocker Ins. Corp., defendant, third-party plaintiff and appellee; argued by A. Wm. Lucas, Bismarck.

PEDERSON, Justice.

This appeal by Pilgrim Life Insurance Company is from a judgment, from an or-

der denying a Rule 52(b) motion to amend the findings and the judgment, and from an order denying a Rule 59 motion for a new trial. This case raises for the first time in this State the question of whether knowledge of a medical history (other than knowledge of impending death) by agents or brokers must be communicated to the insurer in a credit life insurance transaction when there is apparently no statement of physical condition required.

Emilie Schock, as administratrix of the estate of Leo Schock, sued on a credit life insurance contract obtained through Dwight McVay, executive vice president and manager of the Grant County State Bank, to secure indebtedness owed by Leo Schock to the bank. Defendants in the suit were Pilgrim Life Insurance Company (Pilgrim), the ultimate insurance carrier in this case, and Ocker Insurance Company (Ocker), the broker through whom the insurance was placed. Pilgrim cross-claimed against Ocker, alleging fraudulent misrepresentation and a breach of the duty to disclose material facts by Ocker in submitting the application for coverage. Thereafter, Ocker brought a third-party claim against Grant County State Bank, seeking indemnification in the event judgment was rendered against it.

Leo Schock had been doing business with Grant County State Bank (Bank) for many years, and since 1963 he had purchased credit life insurance through the Bank to secure repayment of his loans. McVay customarily wrote the initial insurance contract and submitted it to Ocker, who would then place it with the ultimate insurance carrier.

Leo became ill in 1973, requiring that he be hospitalized for more than four months between July and the end of December. During this period Mrs. Schock had several contacts with McVay concerning credit life insurance for Leo when his note was to be renewed at the Bank in January 1974. Instead of writing the contract himself before the note was renewed, McVay asked Bruce Parkman, employed by Ocker, to obtain the insurance for Mr. Schock.

The substance of the communications between McVay and Parkman is in dispute. McVay testified that he told Parkman that Leo had a serious illness and that it might be terminal. Parkman testified that he could not recall any conversation with McVay concerning Leo's health. The trial court found as a fact that McVay did tell Parkman about Leo's rumored health problem.

Leo was released from the hospital on December 31, 1973. On January 17, 1974, he renewed his loan at the Bank. The record is not clear as to when, if ever, Leo was notified that he was covered by credit life insurance, which had been placed by Ocker with Pilgrim through two intermediaries, Life Investors Insurance Company and Yanan Associates, the general agent of Pilgrim. Three days after the note renewal Leo was again hospitalized. He died of cancer on February 1.

The trial court, in its memorandum opinion, stated that when credit life insurance is written without medical examination and without inquiry into health, with knowledge that not all insureds are healthy physical specimens, disclosure of such matters is waived by the insurer. The trial court referred to § 26–02–16, NDCC, which provides in part that neither party is bound to communicate such information as the other party waives. The trial court concluded, however, that the right to receive communication of knowledge of impending death is not waived, citing *National Life Insurance Co. v. Harriott,* 268 So.2d 397 (Fla.App. 1972), as authority for the principle that the law forbids insuring against a loss which the insured knows has already occurred. Finding as a matter of fact that none of the parties to the action had knowledge of a reasonable certainty of Leo Schock's impending death, the court, in effect, held that all disclosure requirements had been fulfilled by the parties and ordered judgment in favor of Emilie Schock and dismissed the cross-claim of Pilgrim against Ocker and the third-party claim of Ocker against Grant County State Bank. Pilgrim then moved for amendment of the findings

of fact, conclusions of law and order for judgment, and judgment under Rule 52(b), NDRCivP, or in the alternative for an order granting a new trial under Rule 59, NDRCivP. The trial court denied both motions and this appeal followed.

Initially, we note that Pilgrim's motion under Rule 52(b) for amendment of the findings of fact, conclusions of law and judgment complies with prior decisions of this Court that a fair opportunity must be given to the trial court to correct any alleged error before it is raised as grounds for appeal. In a criminal case, *State v. Haakenson*, 213 N.W.2d 394, 399 (N.D.1973), we said:

"The touchstones hereafter for an effective appeal on any proper issue should be (1) that the matter has been appropriately raised in the trial court so that the trial court can intelligently rule on it, and (2) that there be a valid appeal from the judgment."

See also, *Matson v. Matson*, 226 N.W.2d 659, 664 (N.D.1975), indicating the use of Rule 52(b) motions to define the issues for appeals.

Pilgrim's motion to amend directed itself to the memorandum decision rather than the findings of fact subsequently adopted by the trial court. The motion contained no alternate findings but asked numerous questions, which are not specifically answered in the findings but which can be reasonably understood to be answered in the memorandum opinion and in the conclusions reached by the trial court. Although we have said that findings must be sufficient to enable the appellate court to obtain a correct understanding of the factual issues determined by the trial court, we have also held that we will accept findings without regard to how they are labeled, and that we will include the necessary implications to be drawn therefrom. *Piper v. Piper*, 239 N.W.2d 1, 4 (N.D.1976); *Hegge v. Hegge*, 236 N.W.2d 910, 914 (N.D.1975); *Jahner v. Jacob*, 233 N.W.2d 791, 798 (N.D. 1975); *DeForest v. DeForest*, 228 N.W.2d 919, 924 (N.D.1975); *Ellendale Farmers Union Coopertive Ass'n v. Davis*, 219 N.W.2d 829, 836 (N.D.1974).

Pilgrim's Rule 59 motion for a new trial rested primarily upon the same points relied upon for its motion to amend, plus insufficiency of evidence. It was not specified to the trial court or to this court wherein the evidence was insufficient as required by Rule 28, NDRAppP. This court said in *Piper v. Piper, supra*, at page 3, that " * * * the requirement of specifying grounds in a motion for new trial requires something more than generalities." Pilgrim has not shown us wherein the order denying a new trial was either arbitrary or unreasonable. We thus proceed to the merits of Pilgrim's appeal from the judgment.

In substance, Pilgrim advances two major arguments on appeal:

(1) That McVay, in seeking to place the credit life insurance with companies other than his regular lines, became the agent for the insured rather than for the insurer, and that McVay's subsequent concealment of Mr. Schock's serious illness is imputable to his principal, Mr. Schock, under agency principles, thus voiding the policy for fraudulent misrepresentation.

(2) That even if McVay is held to be the agent of the insurer, and not the insured, the trial court erred as a matter of law in determining that knowledge of medical history or condition of health of the insured need not be communicated in credit life transactions, and in failing to determine that Section 26–02–13, NDCC, imposes a legal obligation upon insurance agents to communicate material facts in good faith to their principals.

## 1. AGENCY STATUS OF MCVAY (GRANT COUNTY STATE BANK)

There is substantial testimony supporting a finding that McVay, in this transaction, acted as agent for Ocker and that Ocker, through intermediaries, Life Investors and Yanan, acted as agent for Pilgrim.

The applicable statute at the time this cause of action arose, Section 26–10–08, NDCC, provides:

"Any person who shall solicit an application for insurance upon the life of another shall be regarded as the agent of the company and not as the agent of the insured in any controversy between the insured or his beneficiary and the company issuing any policy upon such application." [1]

Under this statute a bank cashier who transmitted an insurance application of a mortgagor to an insurance company has been held to be the agent of that insurance company. *Michelsen v. North American Nat. Ins. Co.,* 53 N.D. 391, 206 N.W. 225 (1925).

As agent for Ocker, and ultimately Pilgrim through the intermediaries, McVay's knowledge is imputed to the principal, Pilgrim. *Horswill v. North Dakota Mut. Fire Ins. Co.,* 45 N.D. 600, 178 N.W. 798 (1920). Section 3–03–05, NDCC, provides:

> "As against a principal, both principal and agent are deemed to have notice of whatever either has notice and ought, in good faith, and the exercise of ordinary care and diligence, to communicate to the other."

Pilgrim's acceptance of the application (with such imputed knowledge) estops it from asserting as a defense against Emilie Schock, Leo Schock's illness at the time of the application. *Community National Life Insurance Co. v. Graham,* 418 P.2d 670 (Okl. 1966); *Butler v. Vulcan Life & Accident Insurance Co.,* 179 So.2d 642 (La.App.1965); *Atlantic National Life Ins. Co. v. Bank of Sulligent,* 271 Ala. 531, 125 So.2d 702 (1961).

■ Moreover, the trial court concluded that with credit life insurance, when the insurer fails to inquire into the applicant's condition of health, and fails to require a medical examination, disclosure of medical history by the applicant is not required, and

is waived by the insurer. This states the correct rule of law as to the insured. See also, Sections 26–02–16(3) and 26–02–19, NDCC; *Carner Bank of Miami Beach v. Block,* 260 So.2d 282 (Fla.App.1972). The only disclosure which is not waived, as the trial court held, is knowledge of impending death. The trial court found as a matter of fact that no party to the insurance contract had any knowledge of Leo Schock's impending death.[2]

In the absence of any knowledge of the insured's impending death, the insurer who fails to require a medical examination to inquire into condition of health, waives disclosure of medical history by the insured in credit life insurance transactions. Any knowledge acquired by the insurer's agent is imputed to the insurer. With regard to the ruling in favor of Emilie Schock, we find no clearly erroneous findings and no erroneous conclusions of law. *Eakman v. Robb,* 237 N.W.2d 423 (N.D.1975); *Anderson v. Miller's Fairway Foods,* 225 N.W.2d 579 (N.D.1975).

## 2. DISCLOSURE REQUIREMENTS OF INSURANCE AGENTS

■ The trial court concluded that knowledge of medical history is irrelevant to credit life insurance, and that Ocker, as agent for Pilgrim, had no duty to disclose such knowledge to its principal. The court concluded that the disclosure requirements of the insured and of the insurer's agent are the same in credit life transactions, and that both had a duty to disclose only knowledge of the insured's impending death.

Appellant argues that the trial court erred as a matter of law in applying the same test to an insurance agent as it applied to the insured, and contends that a different test, one of good-faith disclosure

---

1. Section 26–10–08, NDCC, has subsequently been repealed and replaced by Sections 26–17.-1–04 and 26–17.1–05, NDCC. Even if these new enactments had been in effect at the time the cause of action arose, we do not think it would have changed the result under the facts in this case. See also, Section 26–07–02, NDCC, also subsequently repealed.

2. No one in this case has argued, that knowledge of impending death can be waived under Section 26–02–19, NDCC; however, it was asserted that one can only have an opinion of (not knowledge of) impending death and that, under Section 26–02–21, NDCC, opinions are not required to be communicated.

of all material facts, should be applied to insurance agents.

As discussed previously, the evidence clearly establishes that, under the facts in this case, McVay was acting as agent for Ocker, who, in turn, represented Pilgrim through the intermediaries, Life Investors and Yanan Associates. Section 26–02–13, NDCC, defines what information should be communicated by the parties to an insurance contract:

> "Each party to a contract of insurance must communicate to the other in good faith all facts within his knowledge which are or which he believes to be material to the contract and which the other has not the means of ascertaining and as to which he makes no warranty."

It is argued by Pilgrim that this statutory provision imposes a duty upon insurance agents to communicate to their principal, in good faith, all facts within their knowledge which are material, i. e., which would influence the principal in the formation of an estimate of the disadvantages of the proposed contract.

Although it is true that if the information about Leo Schock's health, which McVay testified to, had been disclosed along the agency chain, Pilgrim would likely (but not necessarily) have rejected the contract; nevertheless, we cannot base Ocker's, or any other agent's, duty to Pilgrim upon Section 26–02–13. The Legislature defined "party to a contract of insurance" in Section 26–02–03, NDCC, to mean the "insurer" and the "insured." We conclude that Section 26–02–13 does not apply to disputes between an insurer and its agents and that "agents" are not "parties" within the purview of this statute. We likewise fail to find Pilgrim's contention sustained by any provision in the general law of agency (Title 3, NDCC).

■ The parties here apparently did not think that the terms of the agency contract were of great concern. Our examination discloses that witnesses used such terms as "master contract," "contractual relationship," "commission agreement," and the like. There is specific testimony that there was "no written or oral contract" between Pilgrim and Ocker, and that Ocker became an agent of Pilgrim by merely requesting coverage for Schock on a form furnished by Yanan and Yanan's subsequent placement with Pilgrim. A contractual relationship may be manifested by conduct alone, resulting in an implied contract.

■ Custom and usage and fiduciary relationships can form the basis upon which the terms of an implied contract rest. Pilgrim contends in its brief that an insurance agent's duty of good-faith disclosure of all material facts arises from the custom and practice in the credit life industry not to write insurance or forward applications for coverage with the knowledge of an applicant's serious illness or terminal condition. Custom and usage is defined in Section 1–01–31, NDCC:

> "Usage is a reasonable and lawful public custom concerning transactions of the same nature as those which are to be affected thereby, existing at the place where the obligation is to be performed, and either known to the parties or so well established, general, and uniform that they must be presumed to have acted with reference thereto."

Custom and usage play a prominent role in the insurance industry.

> "Insurance contracts and policies are assumed to have been made in reference to trade usages and customs of the place where the business is transacted and, in the absence of express terms of the contract or policy repelling the inference, they form part of the contract." 25 C.J.S. Customs and Usages § 19g, at 135.

See also, 3 Corbin on Contracts, §§ 556, 557; 21 Am.Jur.2d Customs and Usages, §§ 21–29.

In 4 Couch on Insurance 2d, § 26:341, at 285, the author states:

> "So, an agent's duties may depend upon express contract, or upon the bylaws, rules, and regulations of the company, or upon custom, usage, or a customary course of business. The primary duty of the agent is to act faithfully in the dis-

charge of his obligations. This duty to discharge trusts and duties faithfully, of course, includes compliance with instructions concerning matters pertaining to the agency, as well as the duty to keep the principal informed of known facts which are material, * * * "

Evidence of custom and usage has been used by this court in *Tong v. Borstad,* 231 N.W.2d 795, 798 (N.D.1975), to ascertain the intention of the parties and to aid in the interpretation of a contract. As we stated in that decision:

"Whether a custom or usage exists, then, is a question of fact. Findings of fact made by a trial court sitting without a jury will not be set aside unless clearly erroneous. Rule 52, N.D.R.Civ.P."

The difficulty in the instant case is that the trial court failed to specify the basis upon which it determined that the disclosure requirements of insureds and insurance agents are the same. Neither the trial court's memorandum decision nor the judgment specifically discusses the potential effect of custom and usage upon the duties of the parties involved in this case. We are uninformed as to whether the lower court even considered such matters.

When we peruse the record we find that all witnesses who can be considered as having some expertise in insurance by reason of their experience, to some degree at least, acknowledged that:

"we do not knowledgably give a company a bad risk."

"the only stipulation is that * * * [we are] already on the hook for it."

"we are trying to protect the companies."

The custom and usage thus proven did not establish that credit life insurance agents are obligated to disclose knowledge of health conditions but rather established that agents are obligated to write the basic coverage with a primary carrier before submitting the balance of the coverage to an excess carrier. Apparently, there are built-in motivations for agents to select only good risks through premium retention accounts with primary carriers and this is the protective factor upon which excess credit life insurance carriers rely.

 The record shows that Pilgrim carried only excess coverage in this case and that the carrier of the primary coverage (General United) accepted the loss gracefully, even though that company had no premium retention account with Ocker. If there is another custom or usage upon which primary carriers without premium retention accounts rely to protect themselves, it was not proven and is not involved in this case.

The judgment is in all things affirmed.

ERICKSTAD, C. J., and PAULSON, VOGEL and SAND, JJ., concur.