_____

No. 94-3884

_____


Woods Farmers Cooperative            *
Elevator Company,                    *
                                     *
          Appellee,                  *
                                     *   Appeal from the United States
     v.                              *   District Court for the
                                     *   District of North Dakota.
Z-Mega Farms Limited                 *
Partnership I,                       *
                                     *
          Appellant,                 *
                                     *
Z & W Ag Enterprises, Inc.,          *
also known as Z & W Ag, Inc.;        *
Zehringer Land Company; David        *
Zehringer, *                         *
                                     *
          Defendants-Third           *
          party plaintiffs,          *
                                     *
Pete Werner; Personalized            *
Marketing Services; Doug             *
Lanctot,                             *
                                     *
          Defendants,                *
                                     *
Zehringer Farms,                     *
                                     *
          Defendant-Third            *
          party plaintiff,           *
                                     *
     v.                              *
                                     *
Dallas Glasow; Brad Gust; Al         *
Halvorson; Tom Hansen; Rodger        *
Olson; Dave Strand,                  *
                                     *
     Third Party Defendants.         *

                         _____

          Submitted: May 13, 1996

             Filed: September 11, 1996
                         _____

Before RICHARD S. ARNOLD, Chief Judge, MAGILL, and MURPHY, Circuit Judges.
_____

MAGILL, Circuit Judge.

Woods Farmers Cooperative Elevator Company (the Coop), through its bankruptcy trustee, sued Z-Mega Farms Limited Partnership I (Z-Mega) in a diversity action. The Coop claimed that Z-Mega, and its codefendants, misappropriated Coop funds through a series of fraudulent transactions and breached contracts. The district court[1] found in favor of the Coop and awarded it $686,382.44 in damages from Z-Mega.

The issue in this appeal is the district court's denial of Z-Mega's counterclaim for $212,800.25. In the course of the complex financial interactions between the Coop and Z-Mega, there were two sham transactions in which Z-Mega paid a total $212,800.25 to the Coop as counterparts to earlier sales that had not actually occurred. Z-Mega asserts that the Coop is liable based on three legal theories: conversion, deceit, and agency. We disagree and affirm the district court.

**I.**

This case arises from the less-than-honest financial dealings of Pete Werner, 40% owner of Z-Mega, and Doug Lanctot, an employee of the Coop. The facts of this case are complex and we limit our description to those relevant to this appeal.

The Coop was a rural farmers' cooperative association conducting business as a grain elevator. A board of directors oversaw affairs of the Coop, and Doug Lanctot, who was not on the

_____

[1]The Honorable Karen K. Klein, United States Magistrate Judge for the District of North Dakota.

-2-

board, served as manager charged with running the Coop's daily operations.

Acting on behalf of the Coop, Lanctot entered into an informal arrangement to provide financing to Personalized Marketing Services, Inc. (PMS), a grain marketing advisory company. Pete Werner was the majority shareholder and managing agent of PMS. Under the financing arrangement, the Coop provided PMS with short term, unsecured financing for the purchase and sale of Purchase in Kind (PIK) Certificates. Mem. Op. at 7 n.5. Werner set up a bank account, the PMS PIK Certificate Trust Account, into which he deposited funds from the Coop. PMS drew funds from the account to purchase PIK certificates and deposited the proceeds from the sale of these certificates into this account. PMS then wired to the Coop the repayment of the loan and a financing fee. Initially, this arrangement proved to be very profitable for both the Coop and PMS.

Although the PIK financing arrangement worked well in the beginning, the Coop soon began to have difficulty getting its money back. In August 1987, Werner began to use the Coop's financing funds for purposes other than the purchase of PIK certificates. Werner used Coop funds to finance commodities speculation, personal needs, and, through a check kiting scheme, to pay debts owed to the Coop.

More significant to this appeal, Werner also used Coop funds to finance the operations of other enterprises with which he was associated, most notably Z-Mega. Z-Mega was a limited partnership formed for the purpose of owning and operating a farm on land located in Clay and Becker Counties, Minnesota. Its general partner was Z & W Ag Enterprises (Z & W Ag), a Minnesota corporation in which Werner held a 40% stake and David Zehringer held a 60% stake. Through his ownership of Z & W Ag, Werner had general responsibility for Z-Mega management. He also assumed the

specific responsibility of overseeing the financial affairs of the company.[2]

Werner provided Z & W Ag with $471,000 of Coop funds to make land purchases and obtain letters of credit necessary to establish Z-Mega Farms Limited Partnership I.[3]  In addition to the indirect funding Werner provided to Z-Mega through Z & W Ag, he also funneled $205,000 of the Coop's money directly into Z-Mega accounts.  Mem. Op. at 17.  David Zehringer also received the Coop's funds as a result of Werner's largess.  Zehringer Farms, a farming partnership between David Zehringer and his father, Jack Zehringer, received $210,000 from Werner.  Mem. Op. at 8.  At the end of August 1988, there was a shortfall of approximately $327,000 in the PMS PIK Certificate Trust Account.  Mem. Op. at 12.[4]

Through a series of three sham transactions fabricated by Lanctot and Werner, the Coop was reimbursed for all of the funds it had advanced to the PMS PIK Certificate Trust Account.[5]  By fabricating these transactions, Lanctot and Werner contrived to conceal the $327,000 worth of advances made through PMS.

First, Lanctot and Werner created a fictitious credit sale of PIK certificates worth $108,500.25.  Lanctot created a sales ticket stating that the Coop sold Z-Mega $108,500.25 in PIK certificates on credit instead of paying cash.  Therefore, the Coop's ledgers

---

[2]In November 1988, David Zehringer severely curtailed Werner's role in the financial management of Z-Mega.

[3]Z & W Ag Enterprises served as the general partner of Z-Mega.

[4]On appeal, Z-Mega argues that it fully repaid PMS for any money it received.  The district court did not make a finding on this issue.

[5]Concealment of these transactions was particularly important to Lanctot because, in late July 1988, the Coop's board of directors had warned him not to conduct further business with PMS.

showed an accounts receivable debt owed by Z-Mega in the amount of $108,500.25 on September 19, 1988. PMS and Z-Mega books were also modified to recognize this credit transaction. On September 27, 1988, the Coop received a check from Z-Mega drafted in the amount of $108,560.25 and signed by Pete Werner. Lanctot then applied these funds to the PIK loan balance, thereby reducing the PIK advance balance from $ -327,000 to $ -218,439.75.

The second transaction Lanctot and Werner (for Z-Mega) created to conceal the PIK advance also involved a fictitious sale of PIK certificates. This time Lanctot created a sales ticket stating that the Coop sold Zehringer Farms $117,200 in PIK certificates and that Zehringer Farms charged this purchase instead of paying cash. Lanctot then modified the Coop's ledgers to show a reduction in the PIK advance account and a new accounts receivable debt owed by Zehringer Farms in the amount of $117,200 dated September 19, 1988. PMS's and David Zehringer's accounts were also modified to recognize this transaction. On December 28, 1988, Zehringer Farms issued a check to the Coop for $119,544 ($117,200 plus interest). This fictitious sale further reduced the PIK advance balance from $ -218,439.75 to $ -101,239.75.

Finally, to set off the remaining debt, Lanctot created a fictitious credit sale of $104,240 in PIK certificates from the Coop to Z-Mega. Lanctot then modified the Coop's ledger to show a $104,240 reduction in the PIK advance account and a corresponding accounts receivable debt owed by Z-Mega. Z-Mega paid this debt in kind through a delivery of soybeans to the Coop made on October 20, 1988. Instead of paying Z-Mega the normal 80% advance for the soybeans, the Coop credited Z-Mega's account for $104,240 and issued a $5,760 check for the remainder of the proceeds. The $104,240 credit for the soybeans set off the fictitious $104,240 accounts receivable debt for the PIK certificates on the Coop's ledgers. By the end of December 1988, when these three sham transactions had been completed, the Coop had been reimbursed all

-5-

of the funds it had advanced to PMS.[6]

On April 13, 1989, the Coop, through its bankruptcy trustee Wayne Drewes, filed a civil action in federal district court to recover funds which it alleged were wrongfully appropriated from the Coop by Werner, PMS, Z-Mega, and Lanctot.[7] Originally, the Coop cast its complaint as a federal question case based on a Racketeer Influenced and Corrupt Organizations Act (RICO) claim with several supplementary state claims. After the district court dismissed the Coop's RICO claim, the Coop recast its complaint as a diversity suit based on state tort and contract claims.

A bench trial was held from October 25 through November 2, 1993. The Coop claimed at trial that Z-Mega, Z & W Ag, Zehringer Land Co., Zehringer Farms, and David Zehringer were jointly and

---

[6]The Coop had grounds, besides these PIK transactions already discussed, to sue the various defendants.

The Coop used Werner and PMS as an intermediary in the sale of corn. Under the arrangement, the corn buyers were to make their purchase payment to the Coop through PMS. Werner, however, began to delay submission of the corn proceeds to the Coop, instead using the funds to finance his own business interests. Mem. Op. at 22. As a result of Werner's actions, the Coop suffered a $481,291.45 loss.

Z-Mega owed Farm Credit Services $516,092.24 in principal and interest on land purchases. Werner warned Lanctot that if Lanctot did not help finance these land payments, PMS would be unable to repay the Coop the outstanding debts. Mem. Op. at 29. Lanctot advanced over $480,000 in Coop funds to Z-Mega which was never repaid. Mem. Op. at 29.

Finally, in separate transactions, Z & W Ag purchased $79,270.20 in PIK certificates and Z-Mega purchased $79,860.03 in PIK certificates from the Coop. The understanding was that they would pay the Coop after it sold the PIKs. In breach of the contract, neither Z & W Ag nor Z-Mega ever paid the Coop. Mem. Op. at 42-43.

[7]By the time of trial, Z-Mega had also filed a Chapter 7 bankruptcy petition and the bankruptcy court appointed Dwight Lindquist to serve as the Chapter 7 trustee.

severally liable for the fraud and deceit of their alleged agents Werner and David Zehringer under North Dakota law. Only Z-Mega defended at the trial. Z-Mega counterclaimed, asserting that the Coop had converted $212,800.25 of its funds through two fictitious transactions ($108,500.25 + $104,240).

On October 24, 1994, the district court entered final judgment in favor of the Coop. The court found Z-Mega jointly and severally liable for judgment in the amount of $686,382.44, plus postjudgment interest. On Z-Mega's counterclaim, the court held that under North Dakota law no conversion had occurred because the transactions were authorized. Z-Mega appeals and we affirm.

## II.

We review the district court's legal determinations de novo and its factual findings for clear error. See Burke v. Deere & Co., 6 F.3d 497, 511 (8th Cir. 1993), cert. denied, 114 S. Ct. 1063 (1994); Federal Deposit Ins. Corp. v. Lee, 988 F.2d 838, 841 (8th Cir. 1992).

On appeal, Z-Mega argues that it is entitled to a $212,800.25 setoff against the judgment entered in favor of the Coop for four reasons. As Z-Mega views the case, the two sham PIK transactions orchestrated by Werner and Lanctot constituted a fraud on Z-Mega. Under the North Dakota law of agency, conversion, and deceit, Z-Mega asserts that those two transactions cannot be binding on it. Because Lanctot served as the Coop's agent and participated in the fraud, and because the Coop received the benefit of these fraudulent transactions, Z-Mega believes the Coop should be liable for the money it received in sham PIK sales through a setoff against the judgment against Z-Mega. We disagree.

**A.**

Z-Mega argues that Werner lacked authority to bind it to the terms of the two sham transactions. Z-Mega concedes that Werner served as its agent, but that the scope of his agency did not extend to the transfer of $212,800.25 to the Coop. The resolution of the agency issue is crucial: If Werner acted as Z-Mega's agent in these transactions, then Z-Mega's claim that it repaid PMS in full for the money it borrowed does not affect Z-Mega's ultimate obligation to see that the money is repaid to the Coop. If, on the other hand, Werner was not acting as Z-Mega's agent, then by repaying PMS for the money it borrowed, Z-Mega has fulfilled its obligations. In the latter instance, the Coop would have recourse only to PMS, and Werner as agent of PMS, to recover for the initial fraud against the Coop.

Z-Mega makes two arguments to show that Werner could not have had its authority. First, Z-Mega argues that Werner lacked actual authority because he undertook the sham transactions for the benefit of PMS, and not Z-Mega. Second, it maintains that even if Werner could have had authority for such transactions, the fact that Lanctot had, at a minimum, knowledge of the fraud against Z-Mega strips Werner of that authority. We do not find either of these arguments persuasive.

Under North Dakota law, "[a]n agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights and liabilities which would accrue to the agent from the transactions within such limit, if they had been entered into on his own account, accrue to the principal." N.D. Cent. Code § 3-03-01 (1987). The test for partnership liability for the actions of a single partner is whether the wrong was committed on behalf of, and within the reasonable scope of, the partnership business. See Olson v. Fraase, 421 N.W.2d 820, 832 (N.D. 1988).

While Z-Mega insists that "under no view could these transfers be viewed as furthering the interests of Z-Mega," Appellant's Br. at 32, the district court found otherwise. Indeed, the court was emphatic in its determination that when Werner provided the $212,800.25 to the Coop, he was acting within the scope of the Z-Mega's partnership business. See Mem. Op. at 18. According to the court, "Werner followed through with these transactions in order to maintain a credit line with [the Coop]." Id.

Z-Mega argues that this finding is clearly erroneous because the district court also concluded that Lanctot had no authority to lend money to Z-Mega and no line of credit existed. Indeed, the Coop's board of directors explicitly instructed Lanctot not to conduct business with Z-Mega. Z-Mega is mistaken in emphasizing Lanctot's authority to make loans to Z-Mega, however.

Regardless of his authority to do business with Z-Mega, Lanctot repeatedly provided Coop funds to Z-Mega through Werner. Werner had, in effect, an unauthorized credit line with the Coop which he used for the benefit of Z-Mega. For these loans to continue, however, Lanctot had to succeed in hiding these loan transactions from the board. Werner knew this and, to keep the funds available for Z-Mega use, he engaged in the scheme to repay the Coop through sham transactions. Z-Mega had an interest in protecting its access to ready credit, and the district court's finding that Werner arranged for Z-Mega to pay back debts to the Coop in order to maintain this credit line with the Coop is not clearly erroneous.

In addition, Z-Mega asserts that Lanctot's involvement in the fraud defeats any actual or apparent authority with which Werner might be cloaked. Z-Mega points to the rule articulated in North Dakota Century Code § 3-02-07, which states that:

> An agent never can have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with whom he deals to be, a fraud upon the principal.

Again, Z-Mega's argument fails because of the findings of the district court, which are not clearly erroneous. The district court found that Lanctot had no way of knowing that the two transactions were unauthorized by Z-Mega. A reasonable investigation by Lanctot would have led to the conclusion that Werner had authority to obligate Z-Mega funds. Mem. Op. at 19. Werner had a management role with Z-Mega, and took responsibility for its financial affairs. Z-Mega's check registers were maintained at PMS's offices in Moorhead, Minnesota. To Lanctot it would appear unquestionably rational for Z-Mega to create sham transactions to protect its source of capital. There was no indication that Werner's authority to conduct business on behalf of Z-Mega was limited in any way until November 1988--after completion of the transactions at issue. Id. On this basis, North Dakota Century Code § 3-02-07 does not strip Werner of his authority to enter the two sham transactions on behalf of Z-Mega.

**B.**

Z-Mega argues that the Coop is liable for $212,800.25 because it converted Z-Mega's property. According to Z-Mega, Lanctot and Werner deliberately orchestrated the two sham transactions which created the appearance that Z-Mega was indebted to the Coop. When Z-Mega paid off the fictitious debt and the Coop retained the funds, the conversion occurred.

Under North Dakota law, conversion is the wrongful exercise of dominion over the personal property of another in a manner inconsistent with, or in defiance of, the owner's rights. Harwood State Bank v. Charon, 466 N.W.2d 601, 603 (N.D. 1991). Conversion does not require a bad intention on the converter's part. Rather,

-10-

it only requires an intent to exercise control or interfere with an owner's use to an actionable degree. Id. While we agree that the Coop exercised dominion over the money it received from Z-Mega through the two sham PIK transactions, we disagree that this dominion constitutes a conversion.

Viewing the two transactions in isolation, it appears that the Coop pretended to sell Z-Mega PIK certificates in exchange for real payments of cash and soybeans. The reality only becomes apparent when one perceives the broader context of the dealings between the two entities.

Z-Mega had borrowed significant amounts of the Coop's money through a fraud perpetrated by its agent and general partner, Werner. Because of this initial fraud and because Lanctot, agent for the Coop, had been expressly directed to cease business with PMS, a byzantine scheme for concealing the actual nature of the debts owed by Z-Mega had to be created. From this imperative arose the artifice of the two fictitious PIK sales to Z-Mega. Despite the accounting smoke and mirrors used to mask the nature of the payments from Z-Mega to the Coop, the fact remains that Z-Mega had taken Coop funds through PMS and had an obligation to repay them. Therefore, this is not an instance where conversion law entitles Z-Mega to a setoff. Rather, the two sham transactions between Z-Mega and the Coop represent a straightforward repayment by Z-Mega of funds it acquired through fraud. The fact that the repayment was accomplished through sham transactions is irrelevant.

## C.

Based on Lanctot's involvement in the fictitious sales, Z-Mega also asserts that the Coop committed deceit on Z-Mega. A person commits deceit when he willfully deceives another with the intent to induce him to alter his position to his injury or risk and is liable for any damage which the deceived suffers as a result. N.D.

Cent. Code § 9-10-03.  By statute, North Dakota defines four scenarios by which deceit can be effected:

1.    The suggestion as a fact of that which is not true by one who does not believe it to be true;

2.    The assertion as a fact of that which is not true by one who has no reasonable ground for believing it true;

3.    The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

4.    A promise made without any intention of performing.

N.D. Cent. Code § 9-10-02.

Z-Mega's argument for deceit begs the question of who, exactly, is the victim of the fictitious transactions concocted by Lanctot and Werner. Torts such as fraud and deceit rest on the notion that parties should not be able to create informational advantages through deception.  <u>See</u> 37 C.J.S. Fraud § 3.  Here, however, the informational advantage rested with Z-Mega.

The Coop believed that money lent to PMS would be used for the purchase and sale of PIK certificates.  The Coop's board of directors first realized that the Coop's funds were being used by PMS for purposes other than PIK transactions.  In July 1988, it had prohibited Lanctot from making future loans to PMS and Werner.  The purpose of the sham transaction was to continue to hide from the Coop the loans made through PMS to Z-Mega and other entities.

Lanctot certainly knew that the debt indicated on the books did not reflect the reality of the transactions between the Coop, PMS, and Z-Mega. Werner, as an agent of Z-Mega, also was aware of the sham.  As a 40% owner and officer of Z & W Ag, which is the

general partner of Z-Mega, Werner is closely tied to Z-Mega. Werner directly served as an agent for Z-Mega by handling all of its financial affairs. North Dakota follows the general rule of agency that the principal is chargeable with the knowledge of its agents. See Schock v. Ocker Ins. Corp., 248 N.W.2d 786, 790 (N.D. 1976); Employers Reinsurance Corp. v. Landmark, 547 N.W.2d 527 (N.D. 1996). As such, Werner's knowledge can be imputed to Z-Mega itself. The fact of the matter is that Z-Mega, through Werner, willingly participated in the creation of these "mirage" debts as a means of disguising the earlier fraud. Z-Mega was not the victim, but rather the perpetrator, of fraud and cannot twist the facts and recover for its own wrongdoing.

### III.

For the reasons stated above, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.