Charles ROBAR, a/k/a Charles L. Robar, and Floureine Robar, a/k/a Floureine W. Robar, Plaintiffs and Appellees,

v.

Robert ELLINGSON, Defendant and Appellant.

Civ. No. 9830.

Supreme Court of North Dakota.

Jan. 29, 1981.

J. Thomas Traynor, of Traynor & Rutten, Devils Lake, for plaintiffs and appellees.

Scott R. Thompson, of Foughty, Christianson & Thompson, Devils Lake, for defendant and appellant.

VANDE WALLE, Justice.

Robert Ellingson appeals from a judgment against him and in favor of Charles and Floureine Robar rendered in the district court of Ramsey County. This judgment resulted from a dispute over ownership of property. We affirm.

In 1957, the Robars purchased the property, a parcel of land with a house, which is the subject of this suit. In 1974, the Robars rented the property to Robert and Audrey Ellingson. Approximately one year later the Robars conveyed the property to the Ellingons. The purchase price was $10,000 and the terms were $2,000 down with a note and mortgage for $8,000 payable in monthly installments of $95 with an annual interest rate of 7½ percent.

Marital difficulties beset the Ellingsons within two years after they purchased the property. Audrey filed for divorce on March 10, 1977. By that time the Ellingsons had fallen in arrears on their mortgage payments and on March 16, 1977, Robert Ellingson made a lump-sum payment which brought the account up to date.

Apparently bitter conflict prevailed in the divorce negotiations regarding settlement of property and custody issues. During this period the Ellingsons again became delinquent in their monthly payments.

On August 26, 1977, Audrey signed a quitclaim deed conveying her interest in the property to the Charles Robars. Five days later, the Ellingsons executed a stipulation in the divorce case. The stipulation provided, in part:

"I

"That the defendant shall pay to the plaintiff a lump sum payment of One Thousand Dollars ($1,000.00) and that immediately upon receipt thereof, plaintiff shall vacate the house and premises heretofore owned by the parties located at 110 6th Ave., Devils Lake, North Dakota.

"II

"That immediately upon execution of this Stipulation and settlement agreement the parties hereto shall execute a Quit Claim Deed on the house and premises located at 110 6th Ave., Devils Lake, North Dakota, to Charles Robar.

. . . . .

"XV

"That the plaintiff shall upon the payment of the lump sum settlement, provided in Paragraph I of this Stipulation,

deliver that home and premises located at 110 6th Avenue, Devils Lake, North Dakota, to Charles Robar, in a fit and proper condition and that the plaintiff agrees to indemnify said Robert Ellingson for any damages caused to said premises."

On September 19, 1977, Robert Ellingson and Charles Robar met with Ellingson's attorney, Richard Clapp, in his office. The nature of the conversation at that meeting has become an issue in this appeal, with Ellingson contending that an oral agreement was reached whereby the quitclaim deeds from Robert and Audrey Ellingson would serve as extra security on the original mortgage and that Robar would reconvey the property to Robert Ellingson sometime during the spring of 1978. At any rate, after some discussion, it was decided that Ellingson would pay Robar $100 per month after Ellingson took possession of the house from Audrey. Ellingson then signed a quitclaim deed conveying his interest in the premises to Robar. The two men then delivered the quitclaim deed signed by Audrey Ellingson and the quitclaim deed signed by Robert Ellingson to Howard Toso, a banker who was overseeing Robar's accounts in Devils Lake. At the same time, Ellingson gave Toso $600 and thus brought his delinquent house payments up to date.

Pursuant to the divorce stipulation, Robert paid Audrey $1,000. Ellingson then took possession of the house during the fall of 1977. While in possession he painted the exterior and interior of the house and carpeted the living room. However, he again fell behind in his monthly payments to Robar. The payment record reveals that he made a $100 payment on December 8, 1978, and payments of $500 and $170.43 on January 20, 1978, and February 28, 1978, respectively, for back taxes for the years 1975, 1976, and for all but $10.91 of the 1977 taxes.

By letter dated March 2, 1978, Robar asked Toso to check his account "from September 1975 thru February 1978, to make sure just how many $95.00 a month payments Robert Ellingson has made on the house." The letter continued:

"I believe we have done all that is possible to help him keep up the payments. "We just can't go on this way, as much as we hate to take the house back, it seem like we will have to and resell it to some one else."

By July 28, 1978, Robar, figuring that Ellingson was about $700 to $800 behind in payments, contacted Ellingson and discussed the situation with him. At that time Ellingson paid Robar $200 cash, gave him a check for $500, and also gave him the remaining $10.91 for the 1977 real estate taxes. Later that same day, Mrs. Robar went to see Ellingson for the purpose of introducing him to one of the new owners of the property and to instruct him to begin making his monthly payments to the new owners. Ellingson immediately stopped payment on the $500 check but continued to live in the house until October 1978, when he rented the house to a third party for $175 per month.

On September 1, 1978, the new owners instituted a forcible entry and detainer action against Ellingson. Because Ellingson's answer raised a question of real estate title the matter was transferred from county court to district court. Subsequently, Ellingson initiated a quiet-title action. Shortly thereafter, the Robars and the new owners canceled their sale-purchase agreement and the Robars were then substituted as the plaintiffs in this action. Ellingson's action was tried with this action on stipulation of the parties. This case was heard before the district court without a jury and by memorandum opinion the court concluded that Ellingson had not met his burden of proving "that the quit claim deed, or deeds, absolute in its or their terms, was or were mortgages." This appeal followed.

The primary issue raised on this appeal is whether the quitclaim deeds from the Ellingsons to Robar were meant to serve as only added security on the original mortgage or were intended to reflect an absolute sale.[1]

1. We first address this issue as it relates to Robert Ellingson's quitclaim deed. Our discussion regarding Audrey Ellingson's deed appears later in the opinion.

▇ The long-standing rule in this State is that in determining if a deed is in fact a mortgage, the court looks at all the surrounding circumstances. *Hyland v. Tousley*, 67 N.D. 612, 275 N.W. 340 (1937). Further, the burden of proof in a case of this nature is more stringent than in the normal situation:

"The presumption that an instrument executed with the formality of a deed or a contract deliberately entered into, expresses on its face its true intent and purpose, is so pervasive that he who would establish the contrary must go far beyond the ordinary rule of preponderance. To demand less would be to lose sight of the presumption, which is one of the strongest disputable presumptions known to law. Hence, courts have, with great uniformity, in this class of cases, required the proof that should destroy the recitals in a solemn instrument to be clear, specific, satisfactory, and of such character as to leave in the mind of the chancellor no hesitation or substantial doubt." *Jasper v. Hagen*, 4 N.D. 1, 6, 58 N.W. 454, 456 (1894).[2]

This standard is not only applicable at the trial level, but is also the measure which this court employs on review to determine whether or not a deed operates as a mortgage. *Jasper v. Hagen, supra.*

Ellingson begins his argument by claiming:

"The proper ruling should have been that due to the relationship of mortgagor and mortgagee existing prior to the conveyance by the Ellingsons to Charles Robar, that the deeds were only given as further security for the mortgage between the parties, . . ."

Essentially, Ellingson is asking this court to declare the transaction in dispute a mortgage and thereby preserve his equity of redemption. This equity of redemption has long been regarded as an incident of every mortgage. *Peugh v. Davis*, 96 U.S. 332, 24 L.Ed. 775 (1878). However, the sole fact that a mortgagor-mortgagee relationship exists as to the same property involved in the creation of a grantor-grantee relationship does not compel us to declare a deed, absolute on its face, a mortgage. There exists no prohibition against a separate and distinct contract, entered into in good faith and for good consideration, wherein a mortgagor conveys his interest in the mortgaged property along with his corresponding equity of redemption to the mortgagee. While Ellingson directs us to the maxim "Once a mortgage, always a mortgage," we refuse to interpret that doctrine as applying to future contracts.

Generally speaking, a mortgagor who contends that his deed to the mortgagee was actually a mortgage rather than a sale has two avenues of attack to choose from or to use simultaneously. First, the contesting party may allege that under the circumstances surrounding the transaction he was treated unfairly through overreaching on the part of the mortgagee. Second, the mortgagor may attempt to demonstrate that all the facts and circumstances leading up to, during, and subsequent to the transaction reflect that the intentions of the parties were that the deeds serve as security rather than as instruments for an absolute sale. While Ellingson alludes to the former argument, he concentrates on the latter.

▇ The attitude of courts of equity toward a transaction in which the equity of redemption is conveyed from the mortgagor to the mortgagee has been one of suspicion. Generally, where such a transaction is brought before the court, it is subject to close scrutiny in an effort to determine whether it was voluntarily entered into on the part of the mortgagor under conditions free of undue influence, oppression, unfairness, or unconscientious advantage. Fur-

---

**2.** The presumption is now found at N.D.C.C. Section 47–10–13 and reads:

"*47–10–13. Grant presumes a fee simple title.*—A fee simple title is presumed to be intended to pass by a grant of real property unless it appears from the grant that a lesser estate was intended."

ther, the burden of proving the fairness of the transaction rests on the mortgagee. See 129 A.L.R. 1435. While Ellingson makes reference to these general propositions of law, he makes no real allegation that he entered into the transaction at issue here under the conditions enumerated above. He simply observes:

"These types of [trans]actions invariably are brought [about] when the mortgagor is under considerable financial pressure, duress, and in this case, having marital problems."

Regarding the financial-pressure element, we believe that the existence of that aspect could often be found whether the transaction between the mortgagor and the mortgagee is a mortgage or a sale. As to the reference to duress, we find no factual allegations in Ellingson's argument to give rise to the possibility that he was operating under duress as the result of Robar's conduct. In regard to his marital problems, Ellingson states only that the time of the transaction Robar "knew" of the divorce proceedings between the Ellingsons. Finally, we point to the fact that more than two weeks prior to the meeting which concluded with Ellingson giving his quitclaim deed to Robar, Ellingson executed a stipulation in his divorce case in which he agreed to sign a quitclaim deed to Robar for the same property. We conclude that the circumstances described above cannot be construed to put Robar in a position where he bears the burden of proving that he is innocent of arm-twisting.

Before considering intent, the second prong of Ellingson's argument, we look at the nature of the evidence which the trial court spent considerable time describing in its memorandum decision. That evidence centered on events which transpired in Attorney Clapp's office on September 19, 1977. These events, according to Ellingson, included a conversation between Ellingson, Robar, and Clapp in which a decision was made to put the house in Robar's name because "they were aware of the fact that Audrey would never go along with it if there was a written agreement of any kind." Ellingson claims that on Clapp's rec-ommendation monthly payments to Robar were changed from $95 to $100 to look more like rent and that Clapp said that each party would have to trust each other. Ellingson urges that the conversation was generally to the effect that Robar would reconvey the property sometime during the spring of 1978, after the divorce proceedings.

Robar's version of what transpired at the meeting is not congruent with Ellingson's. Robar denies that he ever made an agreement with Ellingson of the nature asserted by Ellingson. He testified that the $100-per-month payment was the monthly rent agreed upon by the parties and he did recall that something was said regarding the fact that each party would have to trust each other.

Clapp, Ellingson's attorney, recalls the discussion of September 19, 1977, in a light somewhat similar to Robar's version. Clapp remembers that because he had heard that the property wasn't being kept up, Robar wanted Audrey out of the house and there was a discussion concerning the deeding of the property to Robar. Clapp also remembers that while Ellingson perhaps wanted the house, there was no agreement on the part of Robar to reconvey. Clapp denied that he suggested that the monthly payments be increased by five dollars to make it look more like a rental agreement. Clapp advised Ellingson that any agreement to reconvey the land would have to be in writing, and in light of that Ellingson was left with three options: (1) pay the arrearage and allow Audrey to live in the house; (2) foreclosure by Robar of the mortgage; or (3) quitclaim the property to Robar, who would rent it back to Ellingson. Ellingson chose the third alternative but claims that there also was an oral agreement between Robar and himself whereby Robar agreed to convey the property back to Ellingson.

■ Without question, the accounts given by Ellingson, Robar, and Clapp regarding the intentions of the parties reflected in the September 19, 1977, meeting constitute parol evidence. While Ellingson did not, in

his brief nor during oral argument, address this issue, Robar devotes a significant portion of his argument to the proposition that the parol-evidence rule prohibits consideration by the trial court and this court of the conversation of September 19, 1977, in determining the intentions of the parties to the deed.

Long ago, in *Jasper v. Hagen, supra*, this court stated:

> "The rule which admits parol testimony to show that a deed absolute in terms was in fact intended only as security for the performance of some act is too well established to require authorities in its support." 4 N.D. at 6, 58 N.W. at 456.

This exception to the parol-evidence rule,[3] based on the premise that a deed conveys the property without purporting to show the purpose of the act, is not without limitations. In *Gajewski v. Bratcher*, 221 N.W.2d 614 (N.D.1974), this court, after extensive analysis of the cases and statutory provisions related to this issue, clarified the application of the exception. The conclusion in *Gajewski* was that the admission of oral testimony is precluded in equitable actions "to prove that a deed, complete, unambiguous, and absolute in its terms, *in the absence of a specific allegation of fraud, mistake, or accident*, was executed and delivered as a security only, subject to the right to repurchase or the right of redemption by the grantors." [Emphasis added.] 221 N.W.2d at 640–641. Nowhere in the record do we find specific allegations by Ellingson that the transaction at issue here was permeated by fraud, mistake, or accident.[4] This court has the right and duty to exclude from consideration of the intent of the parties in cases such as this all evidence, admitted without objection, in violation of the parol-evidence rule. *Gajewski, supra*, 221 N.W.2d at 631.

While in its memorandum decision the trial court devoted substantial time to discussion of the parol evidence described above, it does not appear that the court relied heavily, if at all, upon this evidence in reaching its decision. Rather, the court found that other evidence introduced by Ellingson to prove intent was not clear, satisfactory, and convincing. Even if the court had integrated the parol evidence as a part of its reasoning, this court has held that a judgment will not be reversed merely because it rests upon inapplicable reasons. *Damm v. National Ins. Co. of America*, 200 N.W.2d 616 (N.D.1972). Further, Ellingson does not, except for describing his version of the September 19, 1977, conversation in a statement of facts portion of his brief, rely on this conversation in his effort to persuade this court that the parties intended a mortgage rather than an absolute sale.

In the light of the above discussion, and particularly the fact that it is the appellee who raises and addresses the issue in this case, we conclude that the harmless-error rule, Rule 61, N.D.R.Civ.P., precludes us from disturbing the judgment of the trial court in any way if the court did rely on inadmissible parol evidence in reaching its decision. Finally, even if the parol evidence had been clearly admissible, the fact remains that Robar and Ellingson entirely contradicted one another regarding what was decided during the September 1977 meeting. When this court reviews oral testimony given to the trial court we are governed by Rule 52(a), N.D.R.Civ.P., and will not disturb the findings of the trial court unless they are clearly erroneous. We con-

---

3. The parol-evidence rule is found at N.D.C.C. Section 9–07–04, "*Intention ascertained from writing alone if possible*," and reads:

> "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible, subject, however, to the other provisions of this chapter."

4. Because both actions involved in this case, the forcible entry and detainer and the quiet-title action, are statutory proceedings initiated by form pleadings, Ellingson did not have the same vehicle as is used in other civil cases to raise an allegation of fraud, mistake, or accident in his pleadings. We point out once again that it may be time for the Legislature to do away with statutory proceedings and require a summons and complaint in all civil proceedings. *In the Matter of Cancellation of Contract for Deed Between Diemert and Johnson*, 299 N.W.2d 546 (1980).

clude that any findings of the trial court which could be linked to the parol evidence are not clearly erroneous.

■ Aside from an allegation that the circumstances under which the transaction took place were unfair, a mortgagor seeking to have a transaction declared one involving a mortgage rather than a sale may argue that the circumstances surrounding the transaction demonstrate that the parties intended a mortgage. *McGuin v. Lee*, 10 N.D. 160, 86 N.W. 714 (1910). It is this alternative assertion which Ellingson urges most strenuously. The burden regarding proof of intent rests on the party attempting to overcome the presumption that a deed, absolute on its face, is an unconditional conveyance. *Dean v. Smith*, 53 N.D. 123, 204 N.W. 987 (1925). Therefore, Ellingson's task is to convince this court by clear, specific, and satisfactory evidence of the merit of his argument.

■ Robar argues that Ellingson must show that the parties intended to make an agreement that Robar would reconvey the property in the spring of 1978. However, this is not the focus of the intent that will be dispositive of the issue here. Even if there had been an agreement of the nature Robar speaks of, such an agreement would only lend some support to Ellingson's argument. There exists no steadfast rule that a covenant to reconvey, under which the grantee/mortgagee will reconvey the property to the grantor/mortgagor if the latter decides to exercise his option to repurchase upon a certain contingency, is a defeasance. *McGuin, supra*. The existence of such an agreement may be one fact, taken into account with all other facts surrounding the transaction, in considering whether or not the parties intended to have a deed function as a mortgage. However, that fact alone is not adequate to prove that result. *McGuin, supra*.

In addition to the existence or nonexistence of an option or contract to repurchase, sell, or redeem, the intentions of the parties to a transaction such as the one at issue here is derived from the conduct of the parties and all the circumstances of the

case. *McGuin, supra*. An extensive analysis of the types of conduct and circumstances considered by the courts in determining this issue is found at 129 A.L.R. 1435. Among the various considerations are:

1. If the original debt of the mortgagor to the mortgagee is extinguished by the deed;

2. If there was adequate consideration for the transaction;

3. If and under what circumstances the mortgagor retained possession of the property; and

4. The nature of the conduct of the parties prior and subsequent to the transaction.

During the trial it was stipulated that the Robars had not executed and filed a satisfaction of mortgage to Ellingson, nor had the note accompanying the mortgage been returned to Ellingson. We recognize that the mortgagee's retention of the uncanceled note in a transaction such as this serves as evidence supporting the proposition that the transaction was intended as a mortgage. *McGuin, supra*. However, in *McGuin*, we also recognized that under some circumstances the retention by the mortgagee of evidence of the mortgage debt may be explained consistently with an intent to sell. In this case, there is no clear, convincing, and satisfactory showing by Ellingson that the reason the Robars did not return the canceled note nor record a satisfaction of mortgage was that the debt had not been canceled. The physical location of the mortgage note, without more, does not serve as strong evidence that the intention of the parties was that a mortgage and not a sale would result.

Generally, where a transaction in the nature of the one here involved is in question, it is claimed that the party occupying the position which Ellingson occupies here received the amount of the mortgage indebtedness as consideration for the deed and therefore the transaction was a sale. If, as Ellingson now claims, the consideration was inadequate as a purchase price, the transaction would tend to appear as one of mortgage rather than sale. However, regarding

the inadequacy-of-consideration factor in an issue such as the one before us, this court has said:

"Were it proven that the consideration was grossly inadequate to the value of the land, it would not be sufficient alone to constitute it as a security transaction. That would be considered as one fact to be weighed in connection with all others in the case, from which to gather what the real intention of the parties was at the time of the execution of these papers." *McGuin, supra,* 10 N.D. at 170, 86 N.W. at 717–718.

The trial court found that at the time Ellingson gave his quitclaim deed to Robar the unpaid balance on the mortgage was $6,746.70. Thus Ellingson had paid $3,253.30 on the $10,000 debt to the Robars. There apparently was no expert testimony presented by either party as to the value of the property at the time the quitclaim deed was executed, although Ellingson claimed that the value had increased by $4,000 to $5,000 dollars. Understandably, a person presented with the opportunity to give his opinion as to the value of his land in a dispute over adequacy of consideration such as is here involved will want to place the value at a substantial variance with the price given. Even if the increase in value as stated by Ellingson is accepted as accurate, we still must apply the rule of considering that figure with all the circumstances surrounding this transaction. *McGuin, supra.*

Another consideration to be made in determining whether or not the evidence is clear, specific, and satisfactory enough to show that the parties intended a mortgage centers on who had possession of the property subsequent to the transaction. In the instant case Ellingson retained possession of the property in question after he executed his quitclaim deed to Robar. However, the testimony was contradictory regarding the circumstances under which Ellingson continued possession. While Ellingson claimed that he remained in and on the property as a mortgagor, Robar insisted that Ellingson was occupying the property as a tenant and was supposed to be paying $100 per month

rent. Thus the critical issue is not who had possession; rather, it is what was the status of the party in possession. The trial court believed Robar's version of the situation and, seeing nothing clearly erroneous regarding this finding, we are bound by Rule 52(a), N.D.R.Civ.P., to leave it intact.

The most forceful evidence presented by Ellingson in his effort to have the transaction in dispute declared a mortgage is the conduct of the parties following Ellingson's execution of the quitclaim deed. He first points out that following the transaction, while in possession of the house, he painted the interior and exterior of the house and carpeted the living room. He also paid all the real estate taxes for 1977. Ellingson did not, however, pay for insurance on the property after the date of the transaction. The insurance premiums on the property for the period August 15, 1977, to August 15, 1978, were paid by Robar.

■ We turn to what this court has considered in the past when faced with the issue of whether or not conduct in the form of improvements supports a claim of ownership. Our frame of reference, by way of analogy, centers on the question of what types of improvements are required for a successful claim that part-performance of an oral contract for the sale of real property will take the contract outside the statute of frauds. This court has determined that in cases where improvements are relied upon as constituting part-performance, the improvements must unmistakably point to the existence of the claimed agreement. If the improvements indicate some other relationship, such as landlord and tenant, or can be accounted for through the application of some other hypothesis, they are not sufficient. *Buettner v. Nostdahl,* 204 N.W.2d 187 (N.D.1973), citing *Granquist v. McKean,* 29 Wash.2d 440, 187 P.2d 623 (1947). Further, the improvements relied upon must be valuable, substantial, and permanent. *Vasichek v. Thorsen,* 271 N.W.2d 555 (N.D. 1978). It would appear in the instant case that there is no unmistakable link between the improvements made by Ellingson and

the existence of an agreement under which he occupied the status of owner. Rather, the evidence existed from which the trial court could have determined that the improvements were more closely linked to a landlord-tenant relationship or, in the alternative, were linked to Ellingson's desire that Robar would reconvey the property to him in the spring of 1978. In addition, the nature of the improvements, painting and laying of carpeting, by no means can be considered within the realm of those which are valuable, substantial, and permanent.

In addition to the improvements made by him and the fact that he paid real estate taxes for 1977, Ellingson relies heavily upon a letter of March 2, 1978, from Robar to his banker, Howard Toso. In that letter Robar wrote, in part:

> "Will you please check our account # 221–591 (checking) from September 1975 thru February 1978, to make sure just how many $95.00 a month payments Robert Ellingson has made on the house.
> "According to our records he is behind quit a number of payments plus the interest.
> "How about taxes and insurance are they up to date?"

The trial court found, and we do not dispute, that:

> "Examination of the letter demonstrates that Robar was neither skilled in letter writing nor in expressing himself. Obviously, Robar does not possess the knowledge and skill of a legal practitioner. While the evidence relied upon by Ellingson has some plausibility, nevertheless, reconveyance was not one of the three options explained by Clapp to Ellingson as being available to him. The evidence is compatible that of the three available options, Ellingson chose to pay up past indebtedness, pay rent and live in the house, no doubt with the hope that he would be accorded a privilege of purchase. This hope, judged by the past relationship of Robar and Ellingson and as should have been known to Ellingson, would have been a matter of grace, possible only if all delinquencies were made current."

In light of the evidence presented by Ellingson, we are not persuaded that the trial court erred in concluding that he failed to prove clearly, convincingly, and satisfactorily that a mortgage, rather than a sale, was intended by the parties. Further, this result is particularly appropriate when we consider below one other circumstance which has bearing on this entire matter.

Prior to August 26, 1977, Audrey and Robert held the property involved here as joint tenants. One joint tenant may convey his entire interest in the property to a third person. *Brandhagen v. Burt,* 117 N.W.2d 696 (N.D.1962). When Audrey executed her quitclaim deed she effectively conveyed her undivided one-half interest to Robar and thereby severed her joint tenancy with Robert. The result of this conveyance was to place Robert Ellingson and Robar in the position of tenants in common. The record reflects no evidence indicating that Audrey intended her deed to have the effect of a mortgage rather than an absolute sale. Nor does Audrey stand before this court making that claim. Ellingson offers nothing to identify the foundation which elevates him to the position from which he now asserts that both his and Audrey's interests were the subject of a mortgage agreement between him and Robar. The property stipulation in the Ellingson divorce does not say that in exchange for $1,000 Audrey was to convey her interest, including equity of redemption, to Robert. Indeed, quite a different arrangement was agreed upon. Audrey was to, and did, convey her interest in the property to Robar. If Robert had wanted Audrey's interest, he could have seen to it that the stipulation brought about this result.

The rationale behind Robert Ellingson's decision not to have Audrey, through the property stipulation, convey to him her interest in the property, brings to mind an even more compelling reason for denying his plea that we find the property at issue here to be the subject of a mortgage. The record is replete with references to the belief that had Audrey known Robert was

attempting to ultimately gain sole ownership of the property she would not have signed a property-settlement agreement designed to facilitate that goal. According to Robert Ellingson's account, the primary purpose of the September 19, 1977, meeting was to establish a method, without Audrey's knowledge, of getting Audrey out of the house and laying to rest all claims she might have to the property. Ellingson now claims that the requirement of the property-settlement stipulation that he pay $1,000 to Audrey had the effect of her granting to him her equitable right of redemption. The property-settlement stipulation is absolutely devoid of any indication that this effect was part of its purpose.

Throughout his argument to this court Ellingson stresses that this action is one in equity. He urges, "Once a mortgage, always a mortgage," and, "As this is an action in equity, Audrey would be estopped in asserting her right of redemption . . ." We agree with Ellingson that an action to determine adverse claims is essentially an equitable action. *Gajewski, supra.* We further recognize that "Equity zealously guards the equity of redemption." *Sherwin v. American Loan & Investment Co.*, 42 N.D. 389, 396, 173 N.W. 758, 761 (1919). However, while Ellingson openly admits that he participated in a covert plan to divest Audrey of her rights in the property, he comes to this court urging that equity demands that his alleged agreement with Robar be protected. With this situation we are quickly reminded of two equitable maxims and conclude that equity demands that they be applied to the facts before us. The first is found at N.D.C.C. Section 31–11–05(8) and dictates: "No one can take advantage of his own wrong." The second is the long-standing "clean hands" doctrine. *Cross v. Farmers' Elevator Co.*, 31 N.D. 116, 153 N.W. 279 (1915). We conclude that Ellingson does not come into equity with clean hands and that he is not entitled to any relief herein, but should be left in the position in which the court found him.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.