**Mavis I. OLSON and Mavis I. Olson, Personal Representative for the Robert W. Olson Estate, Plaintiff, Appellee and Cross Appellant,**

v.

**Leonell W. FRAASE and Paul H. Fraase, d/b/a Fraase Law Firm, Defendants, Appellants and Cross Appellees.**

Civ. No. 870017.

Supreme Court of North Dakota.

March 31, 1988.

Rehearing Denied April 18, 1988.

Beauclair & Cook, Bismarck, for plaintiff, appellee and cross-appellant; argued by James L. Norris.

Fleck, Mather, Strutz & Mayer, P.C., Bismarck, for defendants, appellants and cross-appellees; argued by Steven A. Storslee.

LEVINE, Acting Chief Justice.

Defendants Leonell W. Fraase and Paul H. Fraase, doing business as Fraase Law Firm, appeal from a district court judgment

holding them jointly and severally liable for $238,829.03 in compensatory, nominal and exemplary damages, attorney fees and costs, to plaintiff Mavis I. Olson in her individual capacity and as personal representative of the estate of her husband, Robert W. Olson. We affirm in part and reverse in part.

This multifaceted lawsuit arose from allegedly improper conduct of attorneys Leonell [Lee] Fraase and Paul Fraase during the course of a mineral-buying partnership between Lee and Robert Olson, and during the seven months following Robert's death in November 1983. In order to understand the basis for the trial court's decision, a somewhat detailed recitation of the facts is necessary.

## FACTS

Robert was a farm and ranch realtor whose vision was impaired to the extent that he was considered legally blind. During 1980, Lee and Robert entered into an oral partnership agreement to buy and sell mineral interests. They agreed to equally divide the expenses involved in the enterprise, including the costs of acquiring the mineral interests, and any profits which might accrue through their resale. They further agreed that Lee would provide legal services for the partnership and that Robert would provide his services as a realtor. As a matter of convenience, the mineral interests acquired by the partnership for resale were held in Robert's name alone. During this period of time, Robert was also involved in other business ventures which fared poorly, and consequently, Lee provided most of the capital required to purchase the partnership's mineral interests.

Four of the partnership's mineral transactions are relevant to this case:

1) In 1980, Robert and Lee purchased 525 mineral acres in Grant and Morton Counties from Andrea and Clarence Schollmeyer for $23,625. Lee furnished the entire purchase price and title was placed in Robert's name.

2) In early 1982, Robert, Lee, and Robert Thompson, an independent mineral broker, purchased 190 mineral acres in Morton County from the estate of Annetta Seydel for $5,300. Lee and Thompson provided the purchase price and the minerals were titled in Robert's name. Because the mineral acres could not be immediately resold, 95 acres were transferred from Robert to Thompson, leaving Robert holding title to the remaining 95 acres.

3) In 1980, Robert, Lee, and Thompson purchased 480 mineral acres in Morton County from Albert and Joan Kovash for $21,600. Thompson and Lee provided the entire purchase price and through Thompson's efforts, 400 acres were resold, leaving Lee and Robert with a cash profit and 80 mineral acres free of indebtedness. Ten of these mineral acres were subsequently deeded to Paul Fraase. The remaining mineral acres were titled in Robert's name.

4) The largest transaction was the purchase of the surface and mineral acreage of a ranch in Dunn County. Because of the $250,000 purchase price, it was necessary for other investors to become involved. Lee's brother, Elmer Fraase, expressed an interest in the property and ultimately provided the $60,000 downpayment. Upon payment of the $60,000, 315 acres, approximately one-half of the total mineral acreage, were transferred to the purchasers and titled in Robert's name. Title to the remaining mineral acreage and the total surface acreage was to remain in the sellers until the contract was paid. On April 3, 1981, Robert deeded approximately 157 of the mineral acres to Elmer to serve as security for the downpayment. On the same date, Robert deeded Lee approximately 78 of the mineral acres, representing one-half of the remaining mineral acres. Neither deed was recorded at the time. On May 12, 1981, Robert deeded an additional 50 mineral acres to a purchaser for $20,000, and the money was placed in Robert and Lee's joint checking account. Elmer Fraase eventually decided to withdraw from the transaction. According to Lee, Robert deeded Elmer 35 mineral acres in consideration for his involvement, and this deed was recorded. Excluding the previous unrecorded mineral deeds to Lee and

Elmer, approximately 230 of the original 315 mineral acres remained titled in Robert's name. Robert deeded another 115 mineral acres to Lee, leaving each with equal record title ownership. In addition to miscellaneous other conveyances which were made of a small number of the mineral acres, during 1982 Lee prepared deeds conveying from Robert to W.S. Raymond 177 mineral acres in satisfaction of Robert's personal debt to Raymond on business ventures unrelated to the mineral-buying partnership.

By mid–1982, Lee had contributed substantially more funds for the acquisition of the mineral interests than had Robert. On May 14, 1982, Robert and Lee signed a written agreement, drafted by Lee, under which Robert agreed to convey to Lee various mineral interests from these four transactions "[a]s satisfaction for monies advanced remaining unpaid." [1] As a result of the conveyances outlined in the agreement, Robert held record title to 40 mineral acres from the Schollmeyer transaction, 20 mineral acres from the Seydel transaction, 40 mineral acres from the Kovash transaction, and 12 mineral acres in McKenzie County from a previous trade for some

Dunn County minerals. Robert requested Lee to place his remaining mineral interests in joint tenancy with his wife Mavis, but the necessary documents were never prepared.

Robert died on November 3, 1983. Shortly thereafter, Mavis Olson contacted Lee regarding the procedure for obtaining sales proceeds from cattle Robert had previously consigned to a livestock auction sales barn. Lee referred her to Paul Fraase, who obtained Mavis' appointment as personal representative of Robert's estate. According to Mavis, Lee visited her home in January 1984. Mavis showed him promissory notes that Robert had signed prior to his death. One note was secured by Robert's cattle and co-signed by W.S. Raymond. After the cattle were sold and the proceeds applied to the debt, $36,319.61 remained to be paid. Another note covered a $7,337.27 loan from the Citizens State Bank of Ray. One of the items securing this note was an Olson family automobile. According to Mavis, both Lee and Paul told her that the notes were "chattel mortgages that had to be paid." Mavis used her personal funds to pay off the car note and the balance due on the cattle note.

---

1. The agreement provides as follows:

"AGREEMENT

"Since 1980, the undersigned, Robert W. Olson, 436 Remington Avenue, Bismarck, North Dakota, First Party, and Leonell W. Fraase, 1907 South Grandview Lane, Bismarck, North Dakota, Second Party have at various times purchased mineral interests in western North Dakota and in Montana. It was agreed between the parties at that time and to date, both parties remain in agreement that upon the sale of any mineral acres the profits would be divided equally, less expenses and interest costs.

"Since 1980, Second Party has furnished the capital and has made interest payments on various loans to purchase minerals, and an accounting has been made from time to time between the parties.

"As satisfaction for monies advanced remaining unpaid, First Party does hereby convey to Second Party the following:

"1. 485/2574.18 interest in and to
*Township 136, Range 85*
Section 2: W/2SW/4,SW/4NW/4,SE/4NW/4
Section 5: All
Section 8: N/2
Section 9: N/2,W/2SE/4

Section 10: E/2,NW/4
*Township 137, Range 85*
Section 33: All
Grant and Morton Counties, North Dakota

"2. 75/1280 interest in and to
*Township 135 North, Range 83 West*
Section 27: All
Section 25: All
Morton County, North Dakota

"3. 30/960 interest in and to
*Township 136 North, Range 86 West*
Section 33: NE/4,NW/4
Section 34: NW/4,SW/4,NE/4
Section 35: NW/4
Morton County, North Dakota

"4. Dunn County minerals

"It is agreed between the parties that any proceeds from the sale shall first be applied to the cost and total money expended of principal and interest by Second Party. When all indebtedness between the parties ceases to exist, then both parties agree to execute whatever mineral deeds may be necessary to equalize values.

"It is understood and agreed that parties are not operating as partners in any manner whatsoever and never have been and that the above conveyances are unconditional so that title vests in Second Party."

According to Mavis, in January 1984 Lee advised her that the Fraase Law Firm would have a conflict of interest in handling the estate. Mavis selected the Hoovestol Law Firm to handle the estate and Lee accompanied her to the office on February 8, 1984, where a substitution of attorneys was signed. According to Calvin Hoovestol, Lee had telephoned him earlier and said "that he and Paul had finished this estate for Mavis Olson, that they needed a lawyer to read through it and to sign off." Other than providing information to the Hoovestol Law Firm during the probate of the estate, the Fraases performed no legal services for the estate after the February 8, meeting.

In June 1984, Lee filed a claim against the estate in the amount of $38,736.21 for money owed to him from the mineral-buying partnership. In that same month, Lee recorded his 78–acre Dunn County mineral deed and Elmer Fraase's 157–acre mineral deed. According to counsel, the estate is insolvent.

The plaintiff commenced this action against the Fraases in August 1984 alleging, among other things, "legal malpractice, legal conflict of interest, breach of the defendants' fiduciary duty of utmost good faith as attorneys and as partners with Robert W. Olson, ... conversion of mineral interests, breach of contract, actual fraud, constructive fraud, deceit, fraudulent misrepresentation, and/or creating an implied trust...." The case was tried to the court without a jury.

In its findings of fact and conclusions of law, the trial court determined that an "attorney-client relationship existed between the defendants and Robert Olson at the inception and throughout the life of the Olson–Fraase mineral-buying partnership;" that the "defendants had a legal and ethical obligation to Robert Olson, as a client with whom defendant Lee Fraase entered into a business relationship, either to advise Mr. Olson to seek the advice of outside counsel, or to counsel and advise Mr. Olson regarding the business relationship in the same manner as if the defendants had been outside counsel;" that the May 14, 1982 agreement between Robert and Lee "settled all claims between them as of that date;" that Lee's "act of recording the Elmer Fraase mineral deed ... constitutes a conversion to his own personal benefit of an instrument held in trust for a client, and was an act of deceit;" that Lee's "creditor's claim upon the Robert Olson estate for payment for mineral acres that were Robert Olson's free and clear pursuant to the May 14, 1982, agreement, was an attempt to defraud the Robert Olson estate, and was an act of deceit;" and that the "defendants' attempt to retain control of the probate of the Robert Olson estate was an attempt to defraud the plaintiff, and an act of deceit." The trial court also determined, however, that the "evidence does not show that the plaintiff or the Robert Olson estate has incurred any economic damage as a result [of] defendants' acts of deceit, and failure to advise Robert Olson to seek other counsel."

The trial court further determined that Lee "failed without justification or excuse to prepare the necessary instruments to create a join[t] tenancy interest between Olson and the plaintiff in Olson's remaining minerals, as a result of which the minerals were subject to probate and creditors claims, damaging plaintiff in the amount of $4,400.00;" that based upon defendants' advice and counsel, "plaintiff paid a total of $44,241.30 of her own personal funds to satisfy estate debts, damaging plaintiff in the amount of $44,241.30;" and that Lee "is responsible for any consequence of his over-conveyance of Dunn County minerals."

The trial court awarded the plaintiff the following damages:

"Plaintiff is entitled to judgment against defendants jointly and severally for

"a) the sum of $4,400.00;

"b) the sum of $44,241.30;

"c) interest computed at the legal rate of 6% per annum upon the sum of $48,641.30, computed from January 31, 1984, to the date of entry of judgment;

"d) nominal damages as follows:

"1) $2,500.00 for defendants' violation of their obligations to advise Robert Olson of their conflict of interest and to consult other counsel;

"2) $2,500.00 for the improper recording of the Elmer Fraase and Lee Fraase mineral deeds in June, 1984;

"3) $2,500.00 for the filing of the improper creditor's claim in the Robert Olson estate;

"4) $2,500.00 for the attempt to retain control of the probate of the Robert Olson estate;

"all trebled as mandated by section 27-13-08 NDCC,

"resulting in a total of $30,000.00;

"e) punitive damages in the amount of $75,000.00;

"f) costs and disbursements incurred herein;

"g) reasonable attorney fees incurred in the prosecution of this action."

The trial court ultimately approved attorney fees in the amount of $71,250. Judgment was entered against the defendants for $238,829.03, and they have appealed. The plaintiff has filed a cross-appeal.

## NOMINAL DAMAGES

Many of the trial court's findings in support of its award of nominal damages are premised on its interpretation of the May 14, 1982 agreement. The defendants contend that the trial court erred in determining that, pursuant to the terms of this agreement, the conveyances by Robert to Lee "satisfied all unpaid advances from Lee Fraase to date by conveying to Lee Fraase the majority of the mineral acres held by them." They assert that, contrary to the trial court's interpretation, the agreement acknowledged that an indebtedness continued to exist between the parties after May 14, 1982, and further provided for future conveyances between the parties to equalize their contribution to the partnership business. We find it unnecessary to resolve whether the trial court's interpretation of the agreement is correct, because even if it is, the court's award of nominal damages must be reversed as a matter of law.

The trial court awarded nominal damages of $2,500 for each of four separate acts of the defendants, and then proceeded to treble the resulting $10,000 nominal damage award under § 27-13-08, N.D.C. C.[2] Section 32-03-38, N.D.C.C., provides that "[w]hen a breach of duty has caused no appreciable detriment to the party affected, he may recover nominal damages." Nominal damages have been characterized as "a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages." Restatement (Second) of Torts § 907 (1977).

■ The trial court's award of nominal damages must be reversed for at least two reasons. First, the damages are not "nominal." We agree with courts in other jurisdictions which hold that nominal damages are limited to one dollar. *See Auwood v. Harry Brandt Booking Office, Inc.,* 647 F.Supp. 1551, 1555 (D.Conn.1986), and cases cited therein; *Mellon Bank, N.A. v. Aetna Business Credit,* 500 F.Supp. 1312, 1320 (W.D.Penn.1980) [applying Pennsylvania law]; *Minatoya v. Mousel,* 2 Hawaii App. 1, 625 P.2d 378, 382 (1981); *Page v. New England Telephone & Telegraph Co.,* 383 Mass. 250, 418 N.E.2d 1217, 1218 (1981); *Snyderville Transp. Co., Inc. v. Christiansen,* 609 P.2d 939, 941 (Utah 1980). More significantly, however, under the circumstances of this case, no nominal damage award is allowable.

---

**2.** Section 27–13–08, N.D.C.C., provides:

*"27–13–08. Misconduct of attorney—Penalty—Treble civil damages forfeited.* Every attorney who:

"1. Is guilty of any deceit or collusion or consents to any deceit or collusion with intent to deceive the court or any party;

"2. Willfully delays his client's suit with a view to his own gain; or

"3. Willfully receives any money or other property for or on account of any money or debt which he has not laid out or become answerable for,

"is guilty of a class A misdemeanor and in addition forfeits to the party injured treble damages to be recovered in a civil action."

Three of the four acts of the defendants for which nominal damages were awarded, *i.e.*, recording of the mineral deeds, filing of the creditor's claim, and the "attempt to retain control of the probate" of Robert's estate, are based upon the trial court's findings that these acts were either an "attempt to defraud" Robert or the estate, or were "acts of deceit." The trial court also determined, however, that neither Robert nor the estate suffered any damage as a result of these acts.

▇▇▇ Nominal damages are not recoverable in cases in which damages are an element of the claim for relief and the plaintiff has failed to prove those damages. *See* 22 Am.Jur.2d *Damages* § 8 (1965); D. Dobbs, Handbook on the Law of Remedies, at p. 192 (1973). Some torts, most notably negligence, require proof of damages as an essential element of the plaintiff's case, and where no actual loss has occurred, nominal damages cannot be awarded because the plaintiff has failed, in effect, to establish any liability. *See* W. Prosser and W. Keeton, The Law of Torts § 30 (5th ed. 1984). This court, like others, has placed fraud in this category, ruling that in order to support a legal action or defense, fraud must have produced actual damages. *See Buehner v. Hoeven*, 228 N.W.2d 893, 895 Syllabus 4 (N.D.1975); *Verry v. Murphy*, 163 N.W.2d 721, 731 (N.D.1968); *Federal Land Bank of St. Paul v. Koslofsky*, 67 N.D. 322, 271 N.W. 907, 909 (1936) ["A fraud which has injured no one cannot be made the basis of an action."] It also appears that "deceit belongs to that class of tort of which pecuniary loss generally constitutes part of the cause of action. In other words, the action of deceit is based on fraud and damage; broadly speaking, it will lie when both concur, and will not lie unless both do concur." [3] 37 Am.Jur.2d *Fraud and Deceit* § 283, at pp. 378–379

(1968) (footnotes omitted). *See also Jurcich v. General Motors Corp.*, 539 S.W.2d 595, 600–601 (Mo.Ct.App.1976); W. Prosser and W. Keeton, *supra*, at § 110; § 9–10–03, N.D.C.C. ["One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any *damage which he thereby suffers.*" (emphasis added)]. *But see Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 477 A.2d 1224, 1228–1230 (1984) [holding that compensatory damages are not an essential element of legal fraud when there is some loss, detriment, or injury, and that nominal damages may be awarded in the absence of compensatory damages]. We conclude the trial court's finding that no damage ensued from the defendants' "acts of deceit" or "attempts to defraud" requires that the nominal damage award for these three acts be reversed.

The trial court also awarded nominal damages for "defendants' violation of their [ethical] obligations to advise Robert Olson of their conflict of interest and to consult other counsel." The court likewise determined, however, that neither Robert nor the estate suffered any damage as a result thereof.

▇▇▇ In *Martinson Bros. v. Hjellum*, 359 N.W.2d 865, 875 (N.D.1985), we recognized that the Code of Professional Responsibility [4] does not define standards for civil liability of lawyers for professional conduct but held that violations of the Code constitute evidence to be considered by the trier of fact in a legal malpractice action. We did not hold, as asserted by the plaintiff and apparently accepted by the trial court, that a violation of the Code in and of itself either constitutes a tort or otherwise renders an attorney liable for damages.

*Thiele*, 413 N.W.2d 321, 326 (N.D.1987); *see also Ostlund Chemical Co. v. Norwest Bank of Jamestown*, 417 N.W.2d 833, 836 (N.D.1988).

**3.** The statutory definitions of actual fraud and deceit are similar. Compare §§ 9–03–08 and 9–10–02, N.D.C.C. This court has ruled that, technically, a fraud action brought under the provisions of Chapter 9–03, N.D.C.C., applies only to misrepresentations between parties to a contract, while deceit under the provisions of Chapter 9–10, N.D.C.C., applies where there is no contract between the parties. *Hellman v.*

**4.** The Code of Professional Responsibility, as such, is no longer in effect. Effective January 1, 1988, attorney conduct is governed by the North Dakota Rules of Professional Conduct.

*Martinson Bros. v. Hjellum* merely recognized that conduct proscribed by a rule of professional conduct may also be relevant in determining whether an attorney has breached an already existing civil duty or common law obligation an attorney owes a client. *See generally Greening v. Klamen,* 652 S.W.2d 730, 734 (Mo.Ct.App. 1983); *State ex rel. Bryant v. Ellis,* 301 Or. 633, 724 P.2d 811, 812 (1986); R. Mallen and V. Levit, *Legal Malpractice* §§ 67 and 256 (2d ed. 1981). In such circumstances, it is not violation of the Code, but the underlying conduct which may provide the basis for a legal malpractice or other recognized claim for relief. *See Binstock v. Tschider,* 374 N.W.2d 81, 86 (N.D.1985). We agree with the host of courts which hold that a violation of the Code does not itself form the basis for a claim for relief for damages against a wrongdoing attorney. *See, e.g., Bickel v. Mackie,* 447 F.Supp. 1376, 1383 (N.D.Iowa), *aff'd* 590 F.2d 341 (8th Cir. 1978); *Carlson v. Morton,* 745 P.2d 1133, 1135–1136 (Mont.1987); *Greening v. Klamen, supra; Bob Godfrey Pontiac, Inc. v. Roloff,* 291 Or. 318, 630 P.2d 840 (1981); R. Mallen and V. Levit, *supra,* and cases cited therein. Accordingly, the trial court's entire award of nominal damages is reversed.

## EXEMPLARY DAMAGES

■ The trial court awarded the plaintiff $75,000 in exemplary damages. Exemplary damages may be awarded "when the defendant has been guilty of oppression, fraud, or malice, actual or presumed, ..." § 32–03–07, N.D.C.C.[5] In reviewing appeals from bench trials, this court has strictly construed the requirements of § 32–03–07, holding that the absence of a specific finding of oppression, fraud, or malice, actual or presumed, is fatal to an award of exemplary damages. *See Bismarck Realty Co. v. Folden,* 354 N.W.2d 636, 643 (N.D.1984); *Corwin Chrysler–Plymouth v. Westchester Fire,* 279 N.W.2d 638, 645–646 (N.D.1979). There is no finding of fact in this case directly relating to the trial court's award of exemplary damages. The plaintiff asserts, however, that the trial court's references to the defendants' "attempts to defraud" and "acts of deceit" are sufficient to support the award. We disagree.

Section 32–03–07 is substantially similar to California's exemplary damage statute. *See Corwin Chrysler–Plymouth, supra.* California courts have ruled that inasmuch as the words "oppression, fraud, or malice" are used in the disjunctive, "proof of the cause of action for fraud is itself an adequate basis for awarding punitive damages." *Miller v. National American Life Ins. Co. of California,* 54 Cal.App.3d 331, 126 Cal.Rptr. 731, 733 (1976). *See also Glendale Fed. Savings & Loan Ass'n v. Marina View, Etc.,* 66 Cal.App.3d 101, 135 Cal.Rptr. 802, 822 (1977); *Horn v. Guaranty Chevrolet Motors,* 270 Cal.App.2d 477, 75 Cal.Rptr. 871, 875–876 (1969); *Oakes v. McCarthy Company,* 267 Cal.App.2d 231, 73 Cal.Rptr. 127, 146 (1968). However, the fraud claim for relief must first be established before it will suffice as the basis for an award of exemplary damages. *See Miller, supra; Oakes, supra.* We have concluded that, in view of the trial court's finding that the plaintiff sustained no damage by the defendants' "attempts to defraud" and "acts of deceit," the plaintiff did not establish a claim for relief for either fraud or deceit. Accordingly, because there is no finding that the defendants acted either oppressively or maliciously, the exemplary damage award is reversed.

## ATTORNEY FEES

The trial court, without providing any reasons, also awarded the plaintiff $71,250 as "reasonable attorney fees incurred in the prosecution of this action." This award must also be reversed.

■ Attorney fees are not allowable to the successful litigant in an action unless expressly authorized by statute or by

5. Section 32–03–07, N.D.C.C., was amended by the Legislature in 1987 to require an amended pleading to seek exemplary damages. *See* 1987 N.D.Sess.Laws Ch. 400 § 1. However, the section is "suspended" from July 8, 1987 through June 30, 1993. *See* 1987 N.D.Sess.Laws Ch. 404 § 15.

agreement between the parties. *See Young Bird v. Jerry Harmon Motors, Inc.,* 421 N.W.2d 466 (N.D.1988); *Hall GMC, Inc. v. Crane Carrier Co.,* 332 N.W.2d 54, 64 (N.D.1983); *Hoge v. Burleigh County Water Management Dist.,* 311 N.W.2d 23, 31 (N.D.1981). Although the plaintiff attempts to justify the award under § 28–26–01(2), N.D.C.C., for a frivolous claim, and § 28–26–31, N.D.C.C., for pleadings not made in good faith, there is no indication that the trial court was acting under the authority granted by these statutes and, in any event, the record does not support an award under either statute. We recognize that some courts have held that where a client is required to engage new counsel for a separate action proximately resulting from his attorney's negligence, reasonable attorney fees incurred in the separate action may be awarded in a legal malpractice action as an item of special damages. *See First Nat'l Bank of Clovis v. Diane, Inc.,* 102 N.M. 548, 698 P.2d 5, 12 (Ct.App.1985), and cases cited therein; Annot., 45 A.L.R.2d 62, § 4 (1956). Stated otherwise, attorney fees are awardable where the wrongful act has forced the aggrieved person into litigation with a third party (as a result of the defendant's wrongful act). *See Blair v. Boulger,* 336 N.W.2d 337, 340 (N.D.), *cert. denied,* 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 685 (1983) ["One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action." (quoting Restatement of Torts 2d § 914(2)) ]. However, absent statutory authority, a plaintiff cannot recover attorney fees incurred in the legal malpractice action itself. *E.g., McClain v. Faraone,* 369 A.2d 1090, 1093–1094 (Del.Super. Ct.1977); *Stinson v. Feminist Women's Health Center,* 416 So.2d 1183, 1185 (Fla. Ct.App.1982); *Whitney v. Buttrick,* 376 N.W.2d 274, 281 (Minn.Ct.App.1985); *First Nat'l Bank of Clovis v. Diane, Inc., supra;* R. Mallen and V. Levit, *supra,* at § 313. The trial court's award of attorney fees

"incurred in the prosecution of this action" is reversed.

## DAMAGES FOR LEGAL MALPRACTICE

It is implicit in the trial court's findings and conclusions that the remaining damages were awarded based upon the plaintiff's allegations of legal malpractice. These damages include $4,400 for the failure to place Robert's mineral acres in joint tenancy with Mavis, and a total of $44,241.30 for advising Mavis to pay off the cattle and car loans. Both parties presented expert testimony on these issues.

The standard of care to which an attorney is held in the performance of his professional services is that degree of skill, care, diligence, and knowledge commonly possessed and exercised by a reasonable, careful, and prudent lawyer in the practice of law in the state. *Bohn v. Johnson,* 371 N.W.2d 781, 784 (N.D.1985); *Martinson Bros. v. Hjellum, supra,* 359 N.W.2d at 872 (N.D.1985). In a legal malpractice action, the plaintiff has the burden of proving by a preponderance of the evidence that the attorney breached a professional duty owed her and that the breach was the proximate cause of her damages. *Martinson Bros. v. Hjellum, supra.* Whether an attorney has breached his professional duty, and whether the breach was the proximate cause of the damages, are ordinarily questions of fact. *Martinson Bros. v. Hjellum, supra.*

The trial court found that Lee "failed without justification or excuse" to prepare the necessary instruments to create a joint tenancy between Robert and Mavis in Robert's remaining mineral interests. The court further found that as a result, the mineral interests were subject to probate and creditor's claims, damaging the plaintiff in the amount of $4,400, the value of those interests.

It is well established that an attorney is liable for all losses caused by his failure to follow with reasonable promptness and care the lawful instructions of his client. *See McWhorter, Ltd. v.*

*Irvin,* 154 Ga.App. 89, 267 S.E.2d 630, 631 (1980); *Olfe v. Gordon,* 93 Wis.2d 173, 286 N.W.2d 573, 577–578 (1980); R. Mallen and v. Levit, *supra,* at § 106. An attorney's honest belief that the instructions were not in the best interests of the client is not a defense to a suit for malpractice. *Olfe v. Gordon, supra;* Note, *Attorney Malpractice,* 63 Colum.L.Rev. 1292, 1302 (1963). We conclude that the trial court did not err in awarding the plaintiff $4,400 for Lee's failure to follow Robert's instructions to place the mineral interests in joint tenancy.

The defendants also attack the trial court's award of $36,319.61 in damages resulting from the defendants' advice to Mavis to pay off the cattle loan. The award represents the amount remaining due on a promissory note signed by Robert and co-signed by W.S. Raymond. The trial court determined that, based upon the defendants' counsel and advice, Mavis used her personal funds to satisfy this estate debt. The defendants assert that even assuming the advice was given, it was of no consequence because Mavis intended to pay off the cattle loan so that W.S. Raymond, a personal friend, would not be liable for the balance owed. The defendants' argument is, in effect, an attack on the trial court's determination of proximate cause, which is a question of fact. *E.g., Leno v. Ehli,* 339 N.W.2d 92, 96 (N.D.1983). While we may have viewed the evidence differently if we had been the trier of fact, we cannot say that the trial court's finding that Mavis paid off the cattle note "[b]ased on defendants' advice and counsel" is clearly erroneous.

The defendants also assert that the trial court erred in awarding the plaintiff $7,921.69 in damages for payment of the car loan. On August 12, 1983, Robert received a loan from the Citizens State Bank of Ray. The maturity date of the promissory note was February 8, 1984. One of the items securing the note was a 1979 Cadillac, which was titled in both Robert and Mavis' names. However, Mavis did not sign the promissory note or security agreement. The trial court awarded these damages, which represent the amount due on the note which was paid by Mavis, concluding that "[t]here is no evidence that plaintiff had joined in signing over the Cadillac title to the bank." The defendants assert, in effect, that this award constitutes a double recovery because Mavis received the Cadillac free and clear of any lien of the bank as well as receiving the amount she was required to pay to free the Cadillac of the lien.

Although the trial court's reasoning is somewhat cryptic, we believe that implicit in the trial court's ruling on this issue are determinations that: 1) Robert and Mavis held title to the Cadillac in joint tenancy; and 2) because Mavis did not sign the note and security agreement, the bank did not hold a valid security interest in the Cadillac which could be foreclosed if the note had not been paid.

Whether personal property is held in joint tenancy with the right of survivorship depends on the intentions of the parties and is determined in light of all of the circumstances. *Liebelt v. Saby,* 279 N.W.2d 881, 886 (N.D.1979). We have reviewed the record and conclude that the trial court did not err in determining that Robert and Mavis held title to the car in joint tenancy.

A joint tenant may not convey or otherwise encumber another joint tenant's interest in property without the authorization or consent of the co-tenant. *E.g., Brandhagen v. Burt,* 117 N.W.2d 696, 700 (N.D.1962). The defendants do not assert that Mavis consented to or otherwise ratified Robert's encumbrance of her joint tenancy interest in the car. It is equally fundamental, however, that a joint tenant can deal with strangers as freely as owners of property held individually, and therefore may convey or otherwise encumber his own interest in the property without the consent of the other joint tenant. *Robar v. Ellingson,* 301 N.W.2d 653, 662 (N.D.1981); *Brandhagen v. Burt, supra;* *Adamsen Construction Company v. Altendorf,* 152 N.W.2d 576, 578 (N.D.1967). Because Robert died before the loan became due, the issue becomes whether the bank's rights under the security agreement would have

been, to the extent of Robert's interest in the car, superior to the interest of Mavis as the surviving joint tenant.

 Courts which have recently considered this question have concluded that because ownership in a surviving joint tenant vests immediately upon the other's death, a security agreement encumbering only the interest of one joint tenant is extinguished upon the death of that joint tenant. *See Commercial Banking Co. v. Spurlock,* 238 Ga. 123, 231 S.E.2d 748, 749 (1977); *Ogilvie v. Idaho Bank & Trust Co.,* 99 Idaho 361, 367, 582 P.2d 215, 221 (1978); *Home Trust Mercantile Bank v. Staggs,* 714 S.W.2d 792, 794 (Mo.Ct.App.1986); *Sherman Cty. Bank v. Lonowski,* 205 Neb. 596, 289 N.W.2d 189 (1980); and *Franke v. Third Nat'l Bank & Trust Co.,* 31 Ohio App.3d 189, 509 N.E.2d 955, 958– 959 (1986).[6] The courts in *Spurlock, Ogilvie, Staggs,* and *Lonowski,* reasoned, or relied on real property decisions to the effect, that because a mortgage or pledge of property as security constitutes merely a lien on the property and conveys no title to the secured party, the mortgage or pledge does not operate to sever the joint tenancy and thus the right-of-survivorship feature is left intact. *E.g., People v. Nogarr,* 164 Cal.App.2d 591, 330 P.2d 858, 860–861 (1958); *Harms v. Sprague,* 105 Ill.2d 215, 473 N.E.2d 930, 933 (1984). *Compare* § 35–01–08, N.D.C.C. ["Notwithstanding an agreement to the contrary, a lien or a contract for a lien transfers no title to the property subject to the lien."][7]

We recognize that under the secured transaction provisions of the Uniform Commercial Code, Chapter 41–09, N.D.C.C., "[t]he location of the title to the collateral, as between creditor, the debtor, or a third person, has no significance in determining the effect of an Article 9 secured transaction, the various provisions of that Article being applicable to the transaction without regard to the ownership of the property." 8 R. Anderson, *Uniform Commercial Code* § 9–202:4, at p. 655 (1985) [Footnotes omitted.]. Section 41–09–15 (9–202), N.D. C.C., succinctly provides that "[e]ach provision of this chapter with regard to rights, obligations, and remedies applies whether title to collateral is in the secured party or in the debtor." Nevertheless, the court in *Franke,* noting the indifference to title location under the Code, reached the same result as the other courts.

The *Franke* court rested its conclusion on the basic principle that the deceased joint tenant could not give the bank a security interest in collateral that was greater than his own interest. *See also* 1 Bender's Uniform Commercial Code Service, Secured Transactions § 2.08[3][c] (1987). In other words, the court held that because the debtor's interest consisted of only the debtor's lifetime interest in the property subject to the other joint tenant's right of survivorship, a certificate of deposit, that interest was extinguished upon the debtor's death and, consequently, the bank's security interest was extinguished with it. Responding to the secured creditor's argument against that result, the court in *Franke* explained:

"The bank argues that because Michael had the right to withdraw principal and interest during his lifetime, Dora Franke should not be heard to complain because he merely pledged the certificate of deposit. The simple answer to this argument is that this is not what happened. Michael did not withdraw money from the certificate of deposit. He pledged it, and by the time the bank was entitled to enforce its security interest, Michael's interest in the collateral had been extinguished by his death." *Franke, supra,* 509 N.E.2d at 958.

---

6. In decisions rendered prior to the formulation of the Uniform Commercial Code, courts reached different results on this issue. *Compare Hopkins Place Savings Bank v. Holzer,* 175 Md. 481, 2 A.2d 639, 643 (1938), *with In re Hoffman's Estate,* 175 Misc. 607, 25 N.Y.S.2d 339, 342–343 (1940).

7. Utah courts appear to take the position that the granting of a security interest in personal property by one joint tenant in itself causes a severance of the joint tenancy. *See Clearfield State Bank v. Contos,* 562 P.2d 622, 624–625 (Utah 1977). *Contos* did not involve a situation where the debtor joint tenant had died.

We agree with the rationale employed by the *Franke* court, and, like the other courts which have recently addressed this issue, we conclude that a security agreement encumbering only the interest of one joint tenant is extinguished upon that joint tenant's death prior to default.

■ In this case, because Robert died before the promissory note matured, upon his death Mavis became full owner of the car free of the bank's security interest. Consequently, the trial court's award to Mavis of $7,921.69 for payment of the car note does not constitute a "double recovery" because payment was unnecessary for her to retain full ownership of the car. Accordingly, this award is affirmed.[8]

■ The plaintiff asserts that the trial court erred in failing to treble the $48,-641.30 damage award under the provisions of § 27–13–08, N.D.C.C. This award represents the damages for her payment of the car and cattle loans and Lee's failure to place the mineral interests in joint tenancy. Section 27–13–08(1), N.D.C.C., provides in pertinent part that an attorney who is guilty of deceit or collusion or consents to deceit or collusion, with intent to deceive the court or any party, forfeits to the party injured treble damages. The damages which may be trebled must result from the attorney's acts of deceit or collusion. *See Newman v. Silver,* 553 F.Supp. 485, 498 n. 11 (S.D.N.Y.1982), *aff'd in part and vacated in part,* 713 F.2d 14 (2d Cir.1983); *Michalic by Nakovics v. Klat,* 128 A.D.2d 505, 512 N.Y.S.2d 436, 437–438 (1987); *Diprima v. Diprima,* 111 A.D.2d 901, 490 N.Y.S.2d 607, 608 (1985), construing a similar New York law. These damages were awarded for legal malpractice. The trial court found no actual damages as a result of defendants' "acts of deceit." Accordingly, the trial court did not err in refusing to treble this award.

■ Paul asserts that there is no basis for the trial court to hold him jointly and severally liable for the damage award. Initially, we note the trial court found as a fact that "[b]ased on *defendants'* advice and counsel, plaintiff used her own personal funds to pay off the car note and the balance due on the cattle note...." [Emphasis added]. Mavis testified at trial that not only Lee, but Paul told her that the chattel mortgages had to be paid. Thus, this finding is not clearly erroneous, and supports the imposition of personal liability on Paul for the damages for payment of the car and cattle loans.

■ With regard to the $4,400 award for the failure to place Robert's mineral interests in joint tenancy, there is no evidence to indicate that Robert requested Paul to do so. However, the defendants admitted in their answer and the trial court implicitly found that they were partners in the law firm. It is generally recognized that "a partnership, or every member thereof, is ordinarily liable for a tort committed by one of the members acting within the scope of the firm's business, even though the persons sought to be charged did not participate in, ratify, or have knowledge of such conduct.... [T]he test of liability is generally based upon a determination of the question whether the wrong was committed in behalf of and within the reasonable scope of the business of the partnership." Annot., *Vicarious Liability of Attorney for Tort of Partner in Law Firm,* 70 A.L.R.3d 1298, 1301 (1976) (footnotes omitted). *See also* §§ 45–06–01, 45–06–05, and 45–06–07(1), N.D.C.C.; *Truscott v. Peterson,* 78 N.D. 498, 50 N.W.2d 245, 255 (1951). We believe that Lee's failure to place the mineral interests in joint tenancy, as requested by Robert, was a failure which fell within the "ordinary course of the business of the partnership," § 45–06–05, N.D.C.C., and consequently,

---

**8.** The record contains expert testimony that advising Mavis to pay off the car and cattle loans fell below the acceptable standard of care and skill commonly exercised by reasonable and prudent lawyers in the state. The defendants did not assert either on appeal or during the trial that they should not be subjected to liability for advising a client on an unsettled or debatable issue of law in this jurisdiction. *See* R. Mallen and V. Levit, *Legal Malpractice* §§ 200 through 217 (2d ed. 1981). Rather, their defense during trial was that they did not advise Mavis to pay off the loans. Accordingly, we do not consider the question in this case.

rendered Paul jointly and severally liable to the plaintiff on the theory of vicarious liability. *Cf. Roach v. Mead*, 301 Or. 383, 722 P.2d 1229, 1233–1234 (1986).

The defendants assert that the trial court improperly concluded that "defendant Lee Fraase is responsible for any consequence of his over-conveyance of Dunn County minerals." We agree. It is unclear what relevance this conclusion of law has to the instant case because the plaintiff claimed no damages as a result of any over-conveyance and Lee's possible liability to third parties was never at issue. We order that this conclusion be stricken from the judgment.

Accordingly, we affirm the judgment insofar as it awards the plaintiff $48,641.30 plus interest. The judgment is otherwise reversed.

VANDE WALLE, J., and SCHMALENBERGER, District Judge, concur.

GIERKE, J., concurs in result.

SCHMALENBERGER, District Judge, sitting in place of ERICKSTAD, C.J., disqualified.

MESCHKE, Justice, concurring and dissenting.

Except for one blemish, I concur in Justice Levine's thorough and thoughtful opinion. But, I cannot agree that a security agreement by a joint tenant, as to his undivided interest, suddenly becomes ineffective upon that joint tenant's death prior to default. Therefore, I respectfully dissent.

It is a grave judicial action to void any voluntary agreement. This one makes no sense to me.

As Justice Levine recognizes, the notion of invalidating an agreed but executory

mortgage of the undivided interest of one joint tenant seems to be a throwback to an antiquated attitude of real property law. That notion has been rejected in this state for real property. *Renz v. Renz*, 256 N.W. 2d 883 (N.D.1977). *See also*, NDCC 35–03–01.2(1) [1] and *Adamsen Construction Company v. Altendorf*, 152 N.W.2d 576, 579 (N.D.1967). The notion should be rejected for personal property, as well.

North Dakota has not recognized a tenancy by the entireties,[2] and has not adopted community property law.[3] Nor has North Dakota adopted the Uniform Marital Property Act, which would likewise limit management and control of marital property "held in the names of both spouses ... only if they act together." [4]

Legal encyclopedias recognize that a joint tenant can effectively sever the joint tenancy by mortgaging his undivided share. 20 Am.Jur.2d *Cotenancy and Joint Ownership* § 102 (1965); Annotation, *Joint Tenancy—Termination*, 64 A.L.R.2d 918, 934 (§ 14 on *Mortgage or pledge by one or some of joint tenants*). These general authorities do not mention the aberrant cases decreeing subsequent "extinguishment" upon death of that joint tenant.

I cannot agree with either the result or the reasoning (or lack of it) in *Franke v. Third National Bank & Trust Co., supra,* the principal authority relied on by Justice Levine. The Ohio Court of Appeals for Montgomery County is hardly a source of precedent entitled to our deference. The simplistic conclusion of *Franke* ("extinguished") is unconnected to any statutory directive in this state.

Furthermore, *Franke* involved a certificate of deposit, which is a "joint account" under North Dakota law. NDCC 30.1–31–01(1) and (4). North Dakota would not

1. NDCC 35–03–01.2(1) says:
 "A mortgage is a lien upon everything that would pass by a grant of the property, and upon nothing more."

2. Meschke, *Estates in North Dakota,* 30 N.D.L. Rev. 289, 301–03 (1954).

3. 15A Am.Jur.2d *Community Property* § 78 (1976).

4. *See* section 5(2) of House Bill 1049 introduced in the 1987 Session of the North Dakota Legislature, proposing adoption of the Uniform Marital Property Act, which was defeated 25–75. For legislative action, *see* 50th Legislative Assembly (1987) House Journal 111, 517, 533, 1141, 1437.

treat a joint account as *Franke* does. NDCC 30.1–31–13.[5] *See also* 30.1–31–07.[6] Similarly, the older *Holzer* decision cited at footnote 6, as well as the more recent decision of *Commercial Banking Company v. Spurlock, supra,* both cited by Justice Levine, deal with joint accounts, and thus are of little usefulness.

"Extinguishment" should not happen for a joint tenancy in goods any more than for a joint tenancy in bank accounts or in real estate. The Uniform Commercial Code principles, cited but not followed by Justice Levine, should prevail. A specific statutory directive voids only a few security agreements if made by only one spouse, while expressly declaring that a security interest in personal property is governed by the Uniform Commercial Code.

"A security interest in personal property is governed by chapter 41–09 [Uniform Commercial Code], except that a bill of sale or security agreement, that is not a purchase money security interest, with respect to household goods, effects, furniture of married persons, or personal property exempt from execution is void unless the instrument by which it is transferred or encumbered is jointly executed by the husband and wife, if both are living." NDCC 35–01–04, in part.

For these reasons, I would hold that Fraases should not be held liable for correct legal advice as to the security agreement by Robert on his undivided joint interest in the car. Up to the value of that undivided interest, pledged as collateral for Robert's debt to the bank, Mavis should not recover.

While today's novel ruling, "extinguishing" a voluntary security agreement without a statutory reason to do so, may be of small consequence here, it may have significant and unhappy consequences hereafter.

5. NDCC 30.1–31–13 says:

*"Financial institution protection—Setoff.—* Without qualifying any other statutory right to setoff or lien and subject to any contractual provision, if a party to a multiple-party account is indebted to a financial institution, the financial institution has a right to setoff against the account in which the party has or had immediately before his death a present right of withdrawal. The amount of the account subject to setoff is that proportion to which the debtor is, or was immediately before his death, beneficially entitled, and in the absence of proof of net contributions, to an equal share with all parties having present rights of withdrawal."

6. NDCC 30.1–31–07 says:

*"Rights of creditors.—*No multiple-party account will be effective against an estate of a deceased party to transfer to a survivor sums needed to pay debts, taxes, and expenses of administration, including statutory allowances to the surviving spouse, minor children, and dependent children, if other assets of the estate are insufficient. A surviving party, P.O. D. payee, or beneficiary who receives payment from a multiple-party account after the death of a deceased party shall be liable to account to his personal representative for amounts the decedent owned beneficially immediately before his death to the extent necessary to discharge the claims and charges mentioned above remaining unpaid after application of the decedent's estate. No proceeding to assert this liability shall be commenced unless the personal representative has received a written demand by a surviving spouse, a creditor, or one acting for a minor or dependent child of the decedent, and no proceeding shall be commenced later than two years following the death of the decedent. Sums recovered by the personal representative shall be administered as part of the decedent's estate. This section shall not affect the right of a financial institution to make payment on multiple-party accounts according to the terms thereof, or make it liable to the estate of a deceased party, unless before payment the institution has been served with process in a proceeding by the personal representative."