[No. 31398-3-I.   Division One.   February 14, 1994.]

MARJORIE I. KALK, *Individually and as Personal Representative, Respondent*, v. SECURITY PACIFIC BANK WASHINGTON N.A., *Appellant.*

14

BAKER, J., concurs in the result only.

*Robert J. Adolph* and *Adolph & Smyth, P.S.*, for appellant. *John Martin* and *O'Shea, Barnard, Martin & Hendrickson*, for respondent.

SCHOLFIELD, J. — Security Pacific Bank appeals the trial court's grant of partial summary judgment to Marjorie Kalk, contending its perfected security interest in three certificates of deposit was binding on Kalk after the assignor-joint tenant's death. We reverse.

Marjorie Kalk and her mother, Marjorie Worsham, owned three certificates of deposit (CD's) as joint tenants with right of survivorship. The first two CD's, purchased from Seattle Trust in 1982, were in the face amounts of $20,000 and $55,000, respectively. Each CD stated, "This certificate is not transferable except on the books of Seattle Trust." The third CD was purchased from Rainier National Bank (Rainier Bank) in 1983, in the face amount of $100,000, and stated it was a "non-negotiable time certificate of deposit." All three CD's were payable to Marjorie Worsham *or* Marjorie Kalk, and all three designated Worsham and Kalk as joint tenants with right of survivorship. The record does not reflect whose funds were used to purchase any of the CD's.

On January 12, 1983, Worsham signed a Rainier Bank security agreement, pledging the $100,000 Rainier Bank CD as collateral for a loan by Rainier Bank to William Argo.[1] Argo was Worsham's accountant. Argo invested the loan proceeds into Pacific Wood Products, a company he established.

On June 14, 1989, Worsham signed a security agreement to Security Pacific Bank Washington (the Bank), the successor to Rainier Bank. Worsham assigned the two Seattle Trust CD's in the aggregate amount of $75,000 to the Bank as security for another loan to Argo.[2] The Bank took possession of each of the CD's covered by the two security agreements. Kalk did not sign either of the security agreements, nor was she aware of them.

---

[1] By signing the security agreement, Worsham agreed to "[deliver] and [grant] to the Bank a Security Interest" in the $100,000 CD as security for the Bank's loan to William Argo, including all renewals.

[2] This security agreement provided that Worsham's pledge of the two CD's was "security for the payment . . . of all promissory notes executed by William Argo . . . now, in the past or in the future and all renewals, modifications or extensions thereof . . .".

Worsham died March 9, 1990. The Bank renewed the loans to Argo in late March 1990. On December 11, 1990, the Bank informed Argo he was in default on the loans and claimed ownership of the secured CD's. Kalk, as the surviving joint tenant owner of the CD's, was not notified of Argo's default or the Bank's intent to claim the CD's.

Kalk sued the Bank on a number of theories. On cross motions for partial summary judgment, the trial court granted Kalk's motion, concluding that Kalk owned the certificates free of the Bank's security interests at the moment of Worsham's death. The Bank appeals the order and judgment awarding Kalk the face value of the three CD's plus interest.[3]

## WORSHAMS RIGHT TO ASSIGN THE CD'S

The statute applicable to ownership interests of individual deposit accounts, including certificates of deposit,[4] is the Financial Institution Individual Account Deposit Act, RCW 30.22.010 *et seq.* (the Act). The Act defines a joint account with right of survivorship as

> an account in the name of two or more depositors and which provides that the funds of a deceased depositor become the property of one or more of the surviving depositors.

RCW 30.22.040(8). With respect to the rights among depositors, the Act provides that the funds in the account

> belong to the depositors in proportion to the net funds owned by each depositor on deposit in the account, unless the contract of deposit provides otherwise or there is clear and convincing evidence of a contrary intent at the time the account was created.

RCW 30.22.090(2). There is no evidence in the record regarding the proportion of funds contributed by Worsham and Kalk.

■ The Act gives further guidance, providing that

> [p]ayments of funds on deposit in an account having two or more depositors may be made by a financial institution to or

---

[3]The total judgment was for $211,552.

[4]Certificates of deposit are specifically included in the definition of "account". RCW 30.22.040(1).

for any one or more of the depositors named on the account without regard to the actual ownership of the funds by or between the depositors . . ..

RCW 30.22.140. In other words, if a person's name is on an account, that person can withdraw *all* the funds in the account, regardless of ownership of the funds. This is consistent with common law joint tenancy where "each of the tenants has an undivided interest in the whole, and not the whole of an undivided interest." *Merrick v. Peterson*, 25 Wn. App. 248, 258, 606 P.2d 700 (1980).

There is a "contract of deposit" in the record, but only with respect to the Rainier Bank CD, which specifies on its face that "[a]ny Owner may transfer [the Rainier Bank CD] on behalf of all Owners except when it is registered in form requiring action by more than one Owner." The Rainier Bank CD was payable to Worsham *or* Kalk, and was therefore not registered in a form requiring action by more than one owner. Thus, Worsham could "transfer" the Rainier Bank CD, by virtue of its terms, and was authorized to receive "payment" of the Seattle Trust CD's pursuant to RCW 30.22.140.

Logically, the power to withdraw funds, or "receive payment" in the Act's terms, includes the power to assign those funds. The Act's definitions of "withdrawal" and "payment" support that conclusion.

> "Withdrawal" means payment to a person pursuant to check or other directive of a depositor.

RCW 30.22.040(17).

> "Payment(s)" of sums on deposit includes withdrawal, payment by check or other directive of a depositor or his agent, *any pledge of sums on deposit by a depositor* or his agent, any set-off or reduction *or other disposition* of all or part of an account balance . . ..

(Italics ours.) RCW 30.22.040(14). Thus, payment "to or for any one or more of the depositors", RCW 30.22.140, includes "pledge[s] of sums on deposit by a depositor", RCW 30.22.040(14).

> When utilized in determining the rights of a financial institution to make or withhold payment, and/or to take any other action with regard to funds held under a contract of deposit, "depositor" means the individual or individuals who have the current right to payment of funds held under the contract of deposit without regard to the actual rights of ownership thereof by these individuals.

RCW 30.22.040(11), in part.

In short, joint tenant depositors' rights to withdraw all the funds in an account, such as a certificate of deposit account, include the power to pledge those funds. Therefore, because Worsham was a joint tenant, she had the authority to pledge the entire balance of the three CD's, as did Kalk.

■ However, even if Worsham did not have authority to pledge or otherwise withdraw all the funds on deposit, the Bank

> may rely conclusively and entirely upon the form of the account and the terms of the contract of deposit at the time the payments are made. A financial institution is not required to inquire as to either the source or the ownership of any funds received for deposit to an account, or to the proposed application of any payments made from an account. Unless a financial institution has actual knowledge of [a] dispute between depositors, . . . all payments made by a financial institution from an account at the request of any depositor to the account . . . in accordance with this section and RCW 30.22.140, . . . shall constitute a complete release and discharge of the financial institution from all claims for the amounts so paid regardless of whether or not the payment is consistent with the actual ownership of the funds . . ..

RCW 30.22.120. In other words, the Bank may assume each of the owners listed on an account has authority over all of the funds on deposit. Moreover, unless the Bank specifically knows of a dispute regarding the funds, it may make payment "to or for any one or more of the depositors named on the account without regard to the actual ownership of the funds by or between the depositors . . .". RCW 30.22.140. If the funds *are* paid to an account holder who does not own the funds, the proper remedy is for the actual owner to sue the joint tenant; such rights are preserved by RCW 30.22.130.

## PERFECTED SECURITY INTEREST

■ The Bank contends it had a perfected security interest in the three CD's, pursuant to the Uniform Commercial Code (UCC), RCW 62A. Kalk argues the UCC does not apply. Kalk's contention is not supported; we agree with the Bank. First, the security agreements are clearly "intended to create a security interest". RCW 62A.9-102(1)(a). Moreover, even if the security agreements constitute a "pledge" as Kalk contends, Article 9 "applies to security interests created by contract including pledge, [and] assignment . . .". RCW 62A.9-102(2).

Nor are these transactions excluded by RCW 62A.9-104(1), as Kalk contends. That section provides that Article 9 does not apply "to a transfer of an interest in any deposit account (subsection (1) of RCW 62A.9-105), except as provided with respect to proceeds . . .". RCW 62A.9-105(1)(e) defines a "deposit account" as

> a demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, *other than an account evidenced by a certificate of deposit*[.]

(Italics ours.) Thus, UCC Article 9 applies to this transaction involving certificates of deposit.

To determine if the Bank had a perfected security interest, we must categorize the collateral, determine if a security interest attached and, if so, if the Bank perfected a security interest.

### Collateral

■ Characterizing CD's for purposes of Article 9 is a question of first impression in Washington. Although there is authority to the contrary,[5] a CD is an instrument.[6] An instrument is

---

[5]*Bank IV Topeka, N.A. v. Topeka Bank & Trust Co.*, 15 Kan. App. 2d 341, 807 P.2d 686 (1991); *Franke v. Third Nat'l Bank & Trust Co.*, 31 Ohio App. 3d 189, 190, 509 N.E.2d 955, 957 (1986) (in dicta, held nonnegotiable CD is a "'general intangible'", not an instrument).

[6]*Jamison v. Society Nat'l Bank*, 66 Ohio St. 3d 201, 204-05, 611 N.E.2d 307, 310 (1993); *Republican Vly. Bank v. Security State Bank*, 229 Neb. 339, 426 N.W.2d 529 (1988) (nonnegotiable CD is an assignable instrument); *General Elec. Co. v. M&C*

a negotiable instrument (defined in RCW 62A.3-104), or a certificated security (defined in RCW 62A.8-102) or any other writing which evidences a right to the payment of money *and* is not itself a security agreement or lease *and* is of a type which is in [the] ordinary course of business transferred by delivery with any necessary indorsement or assignment[.]

(Italics ours.) RCW 62A.9-105(1)(i). None of the three CD's at issue is negotiable, and none is a certificated security. However, each is clearly a writing which evidences a right to payment of money. Moreover, a CD is not a security agreement or lease, and it is transferred in the ordinary course of business by delivery with an endorsement. In fact, these CD's were *not* endorsed, but Worsham did not intend to transfer them — she intended to pledge them.

### Attachment

Attachment occurs when (a) a security agreement describing the collateral is signed; "(b) value has been given; and (c) the debtor has rights in the collateral." RCW 62A.9-203(1).

Worsham signed a security agreement describing the Rainier Bank CD on January 12, 1983, and she signed a security agreement describing the two Seattle Trust CD's, dated June 14, 1989. Value was given in the form of loans to Argo. Finally, the "debtor" had rights remaining in the collateral. Article 9 provides that

[w]here the debtor [(the person who owes payment)] and the owner of the collateral are not the same person, the term "debtor" means the owner of the collateral in any provision of the Article dealing with the collateral . . ..

RCW 62A.9-105(1)(d). Worsham was thus the "debtor" here: she (and Kalk) owned the collateral relied on by the Bank for Argo's loan, and she (and Kalk) retained an interest in the CD's after her pledges. Thus, because there was a security agreement, value given, and rights retained, the Bank's security interest attached to the three CD's owned by Worsham and Kalk.

---

*Mfg., Inc.*, 283 Ark. 110, 671 S.W.2d 189 (1984) (nonnegotiable, nontransferable CD is an instrument); *Wightman v. American Nat'l Bank*, 610 P.2d 1001, 1004 (Wyo. 1980); *Citizens Nat'l Bank v. Bornstein*, 374 So. 2d 6 (Fla. 1979); *First Nat'l Bank v. Lone Star Life Ins. Co.*, 524 S.W.2d 525, 529-30 (Tex. Civ. App. 1975).

### Perfection

"A security interest in money or instruments . . . can be perfected only by the secured party's taking possession . . .". RCW 62A.9-304(1). The Bank had possession of all three CD's at all relevant times.[7] Therefore, the Bank had a perfected security interest in the three CD's. The only question remaining is what effect, if any, Worsham's death had on the Bank's perfected security interest.

### EFFECT OF WORSHAMS DEATH

As with the characterization of CD's, this is a question of first impression in Washington, and there is a split of authority among other courts which have considered the issue.

Representative of one view is *In re Certificates of Deposit Issued by Hocking Vly. Bank of Athens Co.*, 58 Ohio St. 3d 172, 569 N.E.2d 484 (1991), relied on by the trial court here. In that case, a husband and wife purchased six CD's, with a face value of $10,000 each, payable to the husband *or* wife as joint tenants with right of survivorship. The husband *and* wife subsequently both signed a security agreement pledging their interest in *one* of the CD's as collateral for a loan to them. The following year, the husband alone received five additional loans from the bank, and individually signed five security agreements pledging the remaining five CD's as collateral. The husband died prior to the loans' maturity dates, and the bank and surviving wife each claimed ownership of the five CD's individually pledged by the husband. The Supreme Court of Ohio held that

> when only one joint tenant with the right of survivorship to a certificate of deposit signs a security agreement and pledges the certificate as collateral to secure his or her loan, and such joint tenant dies before the loan is satisfied, the joint tenant survivor(s) is entitled to the entire amount of the certificate, as the bank's interest is extinguished upon the death of the debtor joint tenant.

*Hocking*, at 174. The court characterized the husband's interest in the CD's as an "ownership interest [limited] to

---

[7]Finding of fact 1.4.

his lifetime subject to divestment on his death." *Hocking*, at 174. Several other states agree with this approach.[8]

The other view, rejected by the trial court here, is that a perfected security interest survives a pledging joint tenant's death, and that the surviving joint tenants take ownership subject to the security interest. This view is represented by *Bridges v. Central Bank & Trust Co.*, 926 F.2d 971 (10th Cir. 1991). In that case, one of five joint owners with right of survivorship pledged a CD as collateral for a loan solely to him. The lending bank perfected its security interest by possessing the CD. After the pledgor's default, the lending bank demanded payment of the CD by the issuing bank, which surrendered the funds. The remaining joint tenants sued the issuing bank for breach of contract and conversion. The Tenth Circuit Court of Appeals held that

> an instrument arguably held in joint tenancy and nominated in the alternative under Kansas law can be effectively unilaterally pledged in full by one of the co-owners as security for a loan and later redeemed by the secured creditor in foreclosure.

*Bridges*, 926 F.2d at 974.

The trial court here distinguished *Bridges* because the *Bridges* court relied on a specific Kansas statute "which made an instrument that used the conjunction 'or' as opposed to 'and' a negotiable instrument". Actually, the *Bridges* court relied on that statute, which is similar to RCW 30.22.140, for the proposition that a CD payable to joint tenants in the alternative is "payable to any one of them" and thus any one of them with possession of the CD could cash the CD in or pledge it in its entirety. *Bridges*, at 973 n.2.

The trial court here also distinguished *Heffernan v. Wollaston Credit Union*, 30 Mass. App. Ct. 171, 567 N.E.2d 933 (1991), which the Bank relied on. Heffernan and Dore opened a joint savings account payable to either of them,

---

[8]*Olson v. Fraase*, 421 N.W.2d 820 (N.D. 1988); *Franke v. Third Nat'l Bank & Trust Co.*, *supra*; *Sherman Cy. Bank v. Lonowski*, 205 Neb. 596, 289 N.W.2d 189 (1980); *Ogilvie v. Idaho Bank & Trust Co.*, 99 Idaho 361, 582 P.2d 215 (1978); *Commercial Banking Co. v. Spurlock*, 238 Ga. 123, 231 S.E.2d 748 (1977); *Home Trust Mercantile Bank v. Staggs*, 714 S.W.2d 792 (Mo. Ct. App. 1986).

with a right of survivorship. Dore subsequently pledged part of the balance of the account as collateral for a car loan. Dore died before the loan was due; after the due date, the bank transferred the amount due from the joint account, and the surviving joint tenant sued. The Massachusetts court found that a "party to a Massachusetts joint bank account . . . has the right to withdraw all the funds in a joint account, or any portion of them." *Heffernan*, at 177. The court concluded that "the authority to create a security interest, equitable or otherwise, is included within the ordinary and reasonable meaning of the authority to assign or transfer." *Heffernan*, at 179.

The trial judge here distinguished that case because he thought the decision turned on a specific statute providing for mandatory loans to member depositors in credit unions, and statutory language which specifically provided for pledging jointly held accounts. The mandatory loan statute was mentioned, but the Massachusetts court specifically held it was not applicable.[9] Moreover, the statute specifically allowing for pledges of joint accounts is similar to RCW 30.22.140 in language and identical in meaning.

This view is also represented by *Jamison v. Society Nat'l Bank*, 66 Ohio St. 3d 201, 611 N.E.2d 307 (1993). The facts of that case are analogous to *Heffernan*, except that the account at issue was a payable on death (P.O.D.) certificate of deposit. Thus, unlike Kalk, the P.O.D. beneficiary in *Jamison* had no ownership interest in the account when it was encumbered. The court noted the

> lifetime owner of a P.O.D. C.D. has a complete present interest in the account, and may withdraw its proceeds, change the beneficiary, or pledge the P.O.D. C.D. as collateral for a loan. Upon the owner's death, the beneficiary's interest vests and, if the owner has pledged the P.O.D. C.D. as collateral, the beneficiary is entitled to only an encumbered interest in the P.O.D. C.D. proceeds.

*Jamison*, at 205.[10]

---

[9]*Heffernan*, at 178 n.9.

[10]*See also Wightman v. American Nat'l Bank, supra.*

We find the reasoning of the Ohio Supreme Court in the *Hocking Valley Bank* case unpersuasive when applied to the facts and law of the case before us. *Hocking* followed case law holding the rights of a survivor paramount to a bank's security interest "when the bank fails to encumber the interest of all joint tenants." *Hocking*, at 173-74. The bank prevailed in respect to the one CD where both the husband and the wife signed the security agreement.

■ In this State, there is clear statutory authority for one joint owner to withdraw or pledge all funds on deposit. RCW 30.22.140; RCW 30.22.040(17), (14). The *Hocking* court reasoning cannot prevail in the face of the Washington statutory scheme, which also provides that payment to a depositor

> shall constitute a complete release and discharge of the financial institution from all claims for the amounts so paid regardless of whether or not the payment is consistent with the actual ownership of the funds . . ..

RCW 30.22.120. As previously discussed (see page 17), payment to a depositor includes "pledge[s] of sums on deposit by a depositor". RCW 30.22.040(14).

In light of the Washington statutory scheme, we find the reasoning of *Bridges v. Central Bank & Trust Co., supra,* and *Heffernan v. Wollaston Credit Union, supra,* more persuasive.[11]

---

[11]"Our interpretation is in accord with the probable intent of parties to such transactions. By making a pledge, an equitable pledge, or otherwise creating a security interest in funds on deposit with a bank, a borrower is expressing a willingness to have the funds in the account used to pay the debt when it becomes due, whatever the reason for nonpayment. A bank lending money to a depositor needs reasonable protection against nonpayment, whether caused by the debtor's financial inability to repay the loan or some other cause, such as the debtor's death. The coowner of the account, on the other hand, is no more disadvantaged by another owner's pledging a portion of the funds than by a withdrawal. In fact, a co-owner generally is better off if the funds are pledged to the bank than if they are withdrawn as, upon repayment of the loan, the co-owner's right to use the funds would automatically be restored." *Heffernan*, at 180.

The trial court's grant of partial summary judgment to Marjorie Kalk is reversed.

FORREST, J. Pro Tem., concurs.

BAKER, J., concurs in the result.

Reconsideration denied March 14, 1994.

Reversed at 126 Wn.2d 346.